ROBERT J. SMITH, State Bar No. 162784
*Admitted Pro Hac Vice*
MELINDA S. RIECHERT, State Bar No. 65504
ANNE M. BRAFFORD, State Bar No. 237574
MORGAN, LEWIS & BOCKIUS LLP
2 Palo Alto Square
3000 El Camino Real, Suite 700
Palo Alto, CA  94306-2122
Tel:  650.843.4000
Fax:  650.843.4001
E-mail:   rsmith@morganlewis.com
              mriechert@morganlewis.com
              abrafford@morganlewis.com

RICHARD BLACK, State Bar No. 467982
*Admitted Pro Hac Vice*
BARBARA I. ANTONUCCI, State Bar No. 209039
LITTLER MENDELSON
A Professional Corporation
650 California Street, 20th
San Francisco, CA  94108-2693
Tel:  415.433.1940
Fax:  415.399.8490
E-mail:  rblack@littler.com
              bantonucci@littler.com

Attorneys for Defendant
HEWLETT-PACKARD COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY JOHNSON, JENNIFER RIESE, SHAUN SIMMONS, and JAMES PURVIS, individually, and on behalf of others similarly situated,<br><br>                              Plaintiffs,<br><br>                    vs.<br><br>HEWLETT-PACKARD COMPANY and DOES 1-25 inclusive,<br><br>                              Defendants. | Case No. C-09-03596 CRB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF JENNIFER RIESE'S CLAIMS**<br><br>**[Fed. R. Civ. P. 56]**<br><br>Date:   March 11, 2011<br>Time:  10:00 a.m.<br>Dept.   Courtroom 8<br>Judge: Hon. Charles R. Breyer |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

# TABLE OF CONTENTS

**Page**

A.   Hewlett-Packard's Organizational Structure For Sales Representatives ................ 1

B.   HP's Sales Compensation Plan: The "Contract" With Riese................................. 1

    1.   Riese's Evidence About Her "Deal" With HP Concerning Incentive Compensation....................................................................................... 1

    2.   Riese's Incentive Compensation Was Governed By HP's Sales Compensation Plan Specific To Riese ......................................................... 2

C.   Jennifer Riese's Compensation Plan Varied From Year To Year. ....................... 4

    1.   FY06: Riese Sold Volume Products To Colleges And Universities In The West Region ................................................................................ 4

    2.   FY07 To FY09: Riese Transferred To The Solutions Partner Organization (SPO)......................................................................................... 5

    3.   In Most Relevant Years, OMEGA Played Only A Limited Role In Riese's Incentive Compensation Calculation............................................. 5

E.   OMEGA Supports HP's Business Requirements ................................................. 8

G.   Riese Was Paid Everything She Is Owed ............................................................ 9

H.   OMEGA Properly Credited Riese's Sales Transactions.................................... 10

II.   ARGUMENT ................................................................................................................. 12

A.   Summary Judgment Standard ............................................................................ 12

B.   Riese's Breach Of Contract Claim Fails As A Matter Of Law.......................... 13

    1.   Riese Lacks Evidence That She Was Not Credited With Any Sale To Which She Was Entitled Under Her Sales Compensation Plan .......... 14

    2.   Riese Lacks Evidence That HP Breached Any Contractual Promise To Pay Incentive Compensation Within A Specific Time-Frame ........... 15

    3.   Riese Lacks Evidence That An OMEGA Malfunction Breached Any Contractual Promise And Reduced Her Incentive Pay ................... 17

    4.   Riese Lacks Evidence That The Manual Claims Process Breached Any Contractual Promise Or Resulted In Any Loss Of Incentive Pay......................................................................................................... 17

C.   Riese's Breach Of The Implied Covenant Of Good Faith And Fair Dealing Claim Fails As A Matter Of Law ....................................................................... 18

D.   Riese's Claim For Unjust Enrichment Fails As A Matter Of Law ..................... 20

E.   Riese's Promissory Estoppel Claim Fails As A Matter of Law.......................... 21

F.   Riese's Claim For Penalties For Failure To Pay All Wages Due At The Time Of Termination Under Col. Rev. Stat. 8-4-109 Fails As A Matter Of Law............................................................................................................. 22

G.   Riese's Claim That HP Failed To Timely Pay Her Incentive Pay During The Course Of Her Employment In Violation Of Colo. Rev. Stat. § 8-4-103 Fails As A Matter Of Law......................................................................... 23

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

**TABLE OF CONTENTS**
**(continued)**

Page

H.   Riese's Claim For Improper Deductions In Violation Of The Colorado Wage Act Fails To Create A Triable Issue ............................................ 24

I.   Riese's Claim For An Accounting Fails To Raise A Triable Issue ..................... 25

III.   CONCLUSION ............................................................................ 25

1

## TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*American Woodmen's Life Ins. Co. v. Supreme Camp of Am. Woodsmen,*
   549 P. 2d 423, 426-27 (Colo. App. 1976)..................................................................... 25

5

*Amoco Oil Co. v. Ervin,*
6   908 P. 2d 439, 498 (Colo. 1999) ...................................................................................... 18

7

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 252 (1986)................................................................................................. 13

8

*Arno v. Club Med Inc.,*
9   22 F.3d 1464, 1469 n.6 (9th Cir. 1994)........................................................................... 13

10

*Barnes v. Van Schaack Mortg., a Div. of Van Schaack and Co.,*
   787 P.2d 207. 209 (Colo. Ct. App. 1990) ....................................................................... 14

11

*Bradshaw v. Thompson,*
12   454 F.2d 75, 79 (6th Cir. 1972)....................................................................................... 25

13

*Brill v. Lante Corp.,*
   119 F.3d 1266, 1272 (7th Cir. 1997)............................................................................... 19

14

*Cambridge Electronics Corp. v. MGA Electronics, Inc.,*
15   227 F.R.D. 313, 317 n.2 (C.D. Cal. 2004) ...................................................................... 13

16

*Cobank v. Reorganized Farmers Cooperative Ass'n,*
   170 Fed. Appx. 559, 565 (10th Cir. 2006) ..................................................................... 18

17

*Eichman v. Fotomat Corp.,*
18   880 F.2d 149, 166 (9th Cir. 1989)................................................................................... 15

19

*Fairbank v. Wunderman Cato Johnson,*
   212 F.3d 528, 532 (9th Cir. 2000)................................................................................... 13

20

*Farris v. ITT Cannon, a Div. of ITT Corp.,*
21   834 F.Supp. 1260 (D.Colo. 1993)................................................................................... 23

22

*Fontius Shoe Co. v. Lamberton,*
   78 Colo. 250, 241 P. 542 (1925)..................................................................................... 14

23

*Geras v. International Business Machines Corp.,*
24   726 F.Supp.2d 1292 (D. Colo. 2010)............................................................................... 14

25

*Harris Group, Inc. v. Robinson,*
   209 P. 2d 1188, 1205 (Colo. App. 2009) ....................................................................... 20

26

*Harris v. Thompson,*
27   156 P. 149, 151 (Colo. 1916).......................................................................................... 25

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8

iii

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

**TABLE OF AUTHORITIES**
(continued)

Page

*Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.,*
 77 P.3d 814, 816 (Colo. App.2003) ........................................................................... 20

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
 313 U.S. 487, 496 (1941).......................................................................................... 13

*Lufti v. Brighton Community Hosp. Ass'n,*
 40 P.3d 51, 59 (Colo.App. 2001) ......................................................................... 18, 22

*Nelson v. Elway,*
 908 P.2d 102, 110 (Colo.1995) .................................................................................. 21

*Oracle Corp. v. Falotti,*
 187 F.Supp.2d 1184, 1206-07 (N.D.Cal. 2001) ........................................................ 22

*Redd Iron, Inc. v. International Sales and Services Corp.,*
 200 P.3d 1133, 1136 (Colo. Ct. App. 2008) .............................................................. 20

*Robinson v. Colo. State Lottery Div.,*
 179 P.3d 998, 1007 (Colo. 2008)................................................................................ 20

*Scarry v. Joss,*
 364 P.2d 209, 210 (Colo. 1961) ................................................................................. 15

*See Celotex Corp. v. Catrett,*
 477 U.S. 317, 325 (1986)........................................................................................... 13

*Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Serv.,*
 165 F.3d 1321, 1330 (10th Cir. 1999)........................................................................ 19

*Stearns Management Co. v. Missouri River Services, Inc.,*
 70 P. 3d 629, 632 (Colo. Ct. App. 2003) ................................................................... 21

*Tennille v. Western Union Co.,*
 __F. Supp. 2d__, 2010 WL 4609732, at *3 (D. Colo., Nov. 8, 2010)....................... 20

*Vigoda v. Denver Urban Renewal Authority,*
 646 P.2d 900, 905 (Colo. 1982)................................................................................. 21

*Western Distrib. Co. v. Diodosio,*
 841 P. 2d 1053, 1058 (Colo. 1992) ............................................................................ 13

*Woods v. National Medical Care,*
 25 Fed.Appx. 767, 772 (10th Cir. 2001) .................................................................... 18

**Statutes**

Cal. Code of Civ. Code § 1646 ........................................................................................ 13

Colo. Rev. Stat. § 8-4-101 ............................................................................................... 24

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8    iv

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

**TABLE OF AUTHORITIES**
**(continued)**

Page

Colo. Rev. Stat §. 8-4-103 .................................................................................................. 22

Colo. Rev. Stat. § 8-4-105 .................................................................................................. 24

Colo. Rev. Stat. § 8-4-109 ..................................................................................... 3, 22, 23

Colo. Rev. Stat. § 8-4-126 .................................................................................................. 24

Colo. Rev. Stat. § 13-80-101(1)(a) .................................................................................. 18

Fed. R. Civ. P. 56(e) ............................................................................................................ 13

**Other Authorities**

16 Colo. Prac. Employment Law & Practice § 7.58 (2d ed. 2010) ................................. 23

Restatement (Second) Contracts § 90 ............................................................................... 21

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                          v

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1

**<u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>**

2        Defendant Hewlett-Packard Company ("HP") is entitled to summary judgment on each of

3  Plaintiff Jennifer Riese's claims because she lacks proof that HP deprived her of even a single

4  penny of earned incentive pay.  The crux of Riese's claims is that HP failed to pay her all

5  incentive compensation she was owed in breach of contract and in violation of other common law

6  rights and the Colorado Wage Act.  It is difficult to view Riese's alleged grievance as anything

7  other than opportunistic invention developed after she left HP.  Riese worked for HP (along with

8  her three co-Plaintiffs) in Colorado Springs for *seven years* from March 27, 2002 to February 27,

9  2009 without any record of pay-related complaints.  She began looking for a new job (and

10  ultimately resigned voluntarily) only after HP announced that its Colorado Springs operations

11  would be relocated to New Mexico.  Six months after her departure, on August 5, 2009, THE

12  WALLSTREET JOURNAL ("WSJ") published an article quoting critical remarks made by an HP

13  executive, Randy Runk, about delays in payment of incentive compensation to the sales force in

14  the Technology Solutions Group ("TSG").  *The very next day*, Riese and two former co-workers

15  (Shaun Simmons and Jeffrey Johnson) filed a Complaint in California federal court alleging

16  breach of contract for failing to fully and timely pay incentive compensation.  The Second

17  Amended Complaint ("SAC") attached the WSJ article and labeled it an "admission" by HP "that

18  Omega had problems that prevented thousands of sales employees from getting proper and

19  accurate paychecks."  SAC ¶ 51.

20        But the theory of Riese's case—that a sales compensation calculation engine called

21  OMEGA malfunctioned and mis-paid the salesforce—isn't even supported by the WSJ article on

22  which she relies.  Rather, the temporary delays in TSG referenced in that article had nothing to do

23  with OMEGA.  The article also had nothing to do with Jennifer Riese—who already had resigned

24  and, in any event, was not assigned to the TSG business unit and so would not have been

25  impacted by the TSG delays.  HP's witnesses who are most familiar with OMEGA's software

26  system, as well as HP's retained expert, confirm that OMEGA did not malfunction.  The mistaken

27  finger-pointing at OMEGA has been perpetuated throughout this lawsuit by Plaintiffs—each of

28  whom displays little knowledge of the sales compensation computer system.  The technological

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8        1        MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1    web that supports HP's sales compensation process has many distinct, free-standing components.

2    An issue that may affect one business group may have absolutely no impact on other groups.

3       Riese has displayed little recollection of her seven-year stint at HP and little knowledge of

4    its sales compensation practices.  She has no factual basis for believing that OMEGA

5    malfunctioned in any way that harmed her or that HP breached any duty to her. Because it is

6    *Plaintiff's burden to establish each element of her claims* (not for HP to disprove her claims),

7    pleading ignorance will not suffice.  Summary judgment must be granted where, as here, Riese

8    offers no proof of her claims after a year of extensive discovery:

9       First, Riese lacks proof that HP breached her incentive compensation contract by failing to

10   pay her accurately or on time.  In a nutshell, HP's sales compensation process involves the sale of

11   products and services for which sales representatives receive "credit" under the terms of their

12   specific sales plans during a specified performance period.  Those credits are used to calculate

13   progress toward a set quota, which, in turn, provides the basis for individual incentive payments.

14   Under company policy, Riese was responsible for reviewing sales crediting on a monthly basis

15   and reporting errors.  Fatal to Riese's claim here is the total lack of evidence that HP failed to

16   fully pay her incentive compensation under her sales plans or that it promised such payment

17   within a specific time-frame.  Her allegations and "evidence" consist of generic, conclusory

18   statements about OMEGA malfunctions that had no impact on her.  Further, HP conducted a

19   review of her incentive pay and of OMEGA and concluded that she was fully credited for her

20   sales and fully paid.

21       Second, summary judgment is also warranted on Riese's claim that HP breached the

22   contractual duty of good faith and fair dealing.  She suggests that this duty, implied by law, to

23   carry out the contract with her fairly and honestly, required HP to jettison OMEGA and construct

24   a new compensation system that would have been easier for her to use.  This contention is not

25   supported either by any legal authority or good sense.

26       Third, Riese's claims of unjust enrichment/quasi-contract and promissory estoppel are

27   improper given that a contract is alleged to exist that covers the same subject matter and she has

28   an adequate remedy at law.  She also lacks proof that HP was "unjustly" enriched by benefiting

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8      2      MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

from her services in exchange for an annual salary and incentive pay consistent with the terms of her sales plan.   As to reasonable and detrimental reliance on her part, contrary to her allegations, remaining in a good job for seven years is simply not "detrimental" reliance.

Fourth, her claim under the Colorado Wage Act, Colo. Rev. Stat. § 8-4-109, for unpaid wages and penalties for failing to pay final wages in the next pay period after he resignation fails as a matter of fact and law.  As a matter of fact, Riese lacks any evidence that she still is owed any wages.  As a matter of law, she is barred from recovering penalties for any late payment because she failed to make a written demand for wages on HP within 60 days of her resignation.

Fifth, Riese's claim under the Colorado Wage Act, Colo. Rev. Stat. § 8-4-103, that HP paid her "late" during the course of her employment should be dismissed because there is *no private right of action or remedy* granted under this provision. While the analysis should end there, Riese also lacks evidence of any late payment.  Incentive payments are not deemed "wages" under the Wage Act until they vest under the terms of the contract and are capable of calculation. Riese points to no incentive payment (inside or outside the two-year statute of limitations) that was paid more than 30 days after it "vested" under her sales plan.

Her remaining claims for improper deductions under the Colorado Wage Act and for an equitable accounting depend on a finding that HP failed to pay her earned wages—and thus fail on the same grounds as the prior claims. Additionally, although Riese demanded discovery extending back to 2003, the statutes of limitations applicable to her claims do not extend back further than **August 6, 2006**.  To the extent that Riese asserts claims based on alleged acts that occurred outside the applicable statute of limitations, those claims are time-barred.

For all of these reasons, and as explained below, HP is entitled to summary judgment on all of Riese's claims.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                   3                      MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.**     <u>**FACTUAL BACKGROUND**</u>

3

    **A.**     **Hewlett-Packard's Organizational Structure For Sales Representatives**

4

HP is a tech company with world-wide operations offering hardware, software, and

5

services to consumers, businesses, government agencies, and schools.  Declaration of Robert

6

Slaby ("Slaby Decl.") ¶ 3.  HP's sales force is organized around these products and services by

7

Business Group.  *Id.*  During the relevant time period, the names of HP's three Business Groups

8

were the Technology Solutions Group ("TSG," which later became part of the Enterprise

9

Business Group ("EB"), the Imaging and Printing Group ("IPG"), and the Personal Systems

10

Group ("PSG")).  *Id.*  Generally, TSG focused on business products including storage and

11

servers, enterprise services, and software; PSG focused on business and consumer PCs, mobile

12

computing devices, and workstations; and IPG focused on inkjet, LaserJet and commercial

13

printing, and printing supplies.  *Id.*  In the relevant period, Riese worked only in PSG.  *Id.,* ¶ 4.

14

    **B.**     **HP's Sales Compensation Plan: The "Contract" With Riese**

15

HP employed Riese as an Inside Sales Representative in PSG in Colorado Springs,

16

Colorado from March 27, 2002 to February 27, 2009.  Declaration of Joanne Thiel ("Thiel

17

Decl.") ¶ 18.  Riese was paid an annual salary of about $30,000 to $35,000, and also was eligible

18

for incentive compensation.  *Id.*

19

    **1.**     **Riese's Evidence About Her "Deal" With HP Concerning Incentive Compensation.**

20

21

Riese testified that she had a "deal" with HP starting at the outset of her employment that

she would be paid commission plus a base salary.  Deposition of Jennifer Riese ("Riese Depo"),

22

dated 12-22-2010, 63:9-64:18, attached as Exhibit ("Exh.") 3 to the Declaration of Anne Brafford

23

("Brafford Decl.").  The "deal" was based on "writings as well as oral communications."  *Id.*  She

24

does not recall any of the writings or who gave them to her.  *Id.*  Her interrogatory responses

25

identify the sales plans and policies discussed below as forming the basis for her contract claim.

26

*See* Brafford Decl. ¶12, Ex. 11, Response ("Resp.") No. 17(b).  The oral communication about

27

her "deal" was with her first supervisor at Compaq in 2002, Brad Hinman.  Riese Depo. 67:5-8,

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8          1          MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

68:12-15. She recalls Hinman saying that she would be paid for any product she sold, but does not recall him discussing specific products or when she would be paid. *Id.*, 68:17-69:19.

### 2. Riese's Incentive Compensation Was Governed By HP's Sales Compensation Plan Specific To Riese.

Riese's incentive compensation was governed by her Sales Letter and her Credit and Compensation Plan (which changed yearly) and also by HP's Sales Compensation Policy and Sales Credit Policy.[1] Slaby Decl. ¶ 5. The Sales Compensation Policy sets forth details of the incentive pay process at HP. *Id.*, ¶ 6. It states that no sales employee has a right to payment of incentives until the provisions of the sales plan have been met, and that any exceptions to the Policy "must be approved in writing." *Id.* ¶¶ 8-9. The Sales Credit Policy is tailored to explaining sales crediting for those sales representatives who have a sales quota. *Id.*, ¶ 9.

At least once each year, HP distributed Sales Letters and Credit and Compensation Plans to sales employees who had an assigned quota. *Id.*, ¶ 16. The Sales Letters contained the quota, customer/territory assignments, performance metrics, and performance period. *Id.* The Credit and Compensation Plan explained how incentive compensation would be calculated under that particular plan. *Id.* ¶ 18. The Plans have included language precluding oral modification of their terms. *Id.* [Except where noted, the Sales Letter and Credit and Compensation Plan are referred to collectively as the "Sales Compensation Plan"]. The Sales Compensation Plan governed a sales representatives' compensation for the designated performance period—which typically was quarterly, semi-annual, or annual. *Id.*, ¶ 21. For Riese, her performance period was either quarterly or semi-annual, depending on the year. Thiel Decl. ¶ 20. The Sales Compensation Plans were assigned based on each sales representatives' "Sales Specialty." Slaby Decl. ¶ 21. Each Sales Specialty (of which there were over 200 during each year of Riese's employment) had a unique code and that code was tied to a Sales Letter. *Id.* Riese has acknowledged that "the sales plan, to me, would be the deal that I have between HP and myself." Riese Depo. 97:11-12.

Under the Sales Compensation Plans, "[s]ales credit drives sales employee

---

[1]    The compensation policy and sales credit policy changed names and format over the course of Riese's employment. Slaby Decl. ¶ 6. For ease of reference, they are referred to herein by the general labels of "Sales Compensation Policy" and "Sales Credit Policy."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                    2                    MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

compensation." Slaby Decl. ¶ 22. The principal method for recognizing sales efforts was sales credit based on a defined quota. *Id.* Sales credit was measured against a sales representative's quota during the performance period. *Id.* Sales representatives could receive sales credit for "direct sales" or "indirect sales." *Id.,* ¶ 23. "Direct sales" are those made directly by HP to an end-user customer. *Id.* "Indirect sales" are sales of HP products made by HP "partners" (*i.e.,* distributors) and "resellers" (*i.e.,* dealers, retailers, *etc.* that stock HP inventory)—both of which often are referred to as "HP partners." *Id.* Some HP partners report their sales data to HP, which then can be used in HP's sales crediting process, and some do not. *Id.* The Sales Credit Policy made clear that the timing of when credit was viewable and applied to sales reps was dependent on the Sales Compensation Organization ("SCO") receiving sales data from HP's own order management systems and from reports by HP's partners of their sales data to HP. *Id.,* ¶ 28. The Policy also defined the date that credit would be recognized for direct sales of products, direct sales of services, and indirect sales by reporting partners. *Id.,* ¶ 29. The Sales Credit Policy stated that application of credit would not occur until "all required data is captured." *Id.,* ¶ 28. To track sales credit and spot any issues, sales representatives were given access to OMEGAOnline ("OOL"), which is an Intranet tool where information is posted about sales credits to date and incentive payments. *Id.,* ¶ 33. Under the Sales Compensation Policy, it was "**the responsibility of the sales employee to review sales crediting on a monthly basis and report errors** to the appropriate Sales Compensation Operations team and sales manager." *Id.,* ¶ 34.

The amount of the incentive compensation paid to Riese was based on the percentage of quota that Riese achieved. *Id.,* ¶ 25. The compensation for Riese's achievement was calculated by the Target Incentive Amount ("TIA") applicable to her, which was the amount of incentive compensation that Riese would be paid if she achieved 100% of her quota. *Id.* Incentive pay "is calculated with a period-to-date calculation." *Id.,* ¶ 26. An employee's performance attainment percentage was determined by dividing the cumulative period-to-date sales credits by the employee's quota that applied to the entire performance period. *Id.* This percentage was then

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

DB2/22187541.8

3

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

multiplied by the TIA allocated to the performance for the entire performance period.[2]  *Id.*  (As this quota calculation shows, the incentives at issue in this lawsuit are not "commissions" under the common usage of that term, *i.e.*, a fixed percentage of sales.)  During Riese's employment, her TIA was between $19,300 and $23,800 and her actual incentive compensation payments were $12,329.42 for FY06; $23,559.33 for FY07, and $36,600.24 for FY08.  Thiel Decl. ¶ 21.

In Fiscal Year 2007, HP implemented a 60% Performance Threshold.  Slaby Decl. ¶ 32. Under this Threshold, all incentive compensation paid throughout the performance period was conditional on the sales representative achieving at least 60% TIA and, if they failed to do so, all incentives were recoverable—*i.e.*, had to be re-paid.  *Id.*  Incentives paid monthly were only conditional pay advances that were not deemed earned until the end of the performance period when HP could determine if the sales employee achieved the 60% threshold.  *Id.*  The 60% Threshold applied to Riese in 2007 until the end of her employment in February 2009.  *Id.*

HP's business runs on a Fiscal Year beginning November 1st and ending October 31st. Slaby Decl. ¶ 36.  At the beginning of each Fiscal Year, sales representatives typically were paid a pay advance in the form of a draw.  *Id.*  The draw period was an integral part of HP's incentive compensation process, because it takes time to finalize the terms of new Sales Letters (which change each year) and to set up, load, and test the compensation system to ensure that, for example, quotas and metrics are input accurately.  *Id.*  Once the sales compensation system "opened," actual incentives were calculated for the draw period and, if the draw was less than the incentives paid, an additional payment was made to the sales rep.  *Id.*  HP's Sales Compensation Policy expressly reserved the right implement a draw period "at HP's discretion."  *Id.*

### C.   Jennifer Riese's Compensation Plan Varied From Year To Year.

#### 1.   FY06: Riese Sold Volume Products To Colleges And Universities In The West Region.

In FY05,  Riese was responsible for selling personal computers and peripheral systems to small and medium sized businesses ("SMB").  Thiel Decl. ¶ 22.  In FY06, Riese was assigned to

---

[2]   This is a simplified statement of the calculation to determine performance attainment percentage.  The calculation may be complicated by slopes or accelerators.  Also the metric incentive calculations may be independent of each other in some cases and weighted in other cases.  Slaby Decl. ¶ 26.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                          4                    MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

the State, Local and Education sales team ("SLED") in PSG where she was responsible for selling volume products to colleges and universities in Arizona, Nevada, Hawaii, and Utah. *Id.* "Volume" refers to HP products that are sold in high volumes, but have lesser value than other HP products. *Id.* Because she had transitioned to a new sales group (SLED), HP provided her with a fixed amount of incentive compensation. *Id.*, ¶ 23. "Fixed TIA" (or "FTIA") from November 2005 to May 2006 in the amount of $3,216.66. *Id.* HP provided FTIA to Riese as a grace period during which she could develop her relationships with the customers in the region. *Id.* After this initial period, Riese was credited for sales to these customers. *Id.* The sales data related to her sales was transmitted from various order management systems into databases, and then into SIQP and finally into OMEGA. *Id.*; *see* Brafford Decl. ¶ 2, Exh. 1, Resp. No. 1.

### 2. FY07 To FY09: Riese Transferred To The Solutions Partner Organization (SPO).

In the second half of FY07, Riese transitioned to the Agent group in the Solutions Partner Organization ("SPO") where she remained for the rest of her employment. Declaration of Lance Cannon ("Cannon Decl.") ¶ 1. In SPO, Riese's role changed and her incentive pay became "team-based." She and her Agent group were paid incentive compensation based on sales of certain products that were "influenced" by their assigned partners in Alabama and Mississippi in the Central Region. *Id.,* ¶¶ 2, 9. In FY08, Riese remained in SPO and continued to receive credit for sales by certain HP's partners in the Central region. *Id.,* ¶ 9. In FY09, Riese was responsible for sales influenced by partners in the East region. *Id.,* ¶ 10.

### 3. In Most Relevant Years, OMEGA Played Only A Limited Role In Riese's Incentive Compensation Calculation.

In the second half of FY07 through FY09, OMEGA did not play a central role in Riese's sales crediting. For Riese's Agent team in SPO, sales credit was based on data pulled from HP's Partner Commission System ("PCS"). *Id.*, ¶ 7. PCS is used to calculate an "influencer" or referral fee in the form of commission paid to HP's reporting partners for influencing customers to buy HP products and services. *Id.* PCS pulls sales data from an order management system called VISTA (where HP's sales representatives enter orders of HP sales). *Id.* To credit the Agent team, the PCS sales data then was transmitted to an Access database, manually calculated

by product line, exported into an Excel file, and uploaded into the Channel Sales Reporting Tool ("CSRT") before flowing to OMEGA. *Id.*, ¶ 8.

Determining which sales should be credited to which of SPO's regional teams (*e.g.,* the "East Region") was a multi-step process that was entirely manual and did not include the OMEGA system. *Id.*, ¶ 12. Sales representatives entered the order into HP's internal order management systems. *Id.* If the sales representative identified the partner that influenced the order, and that partner was assigned to Riese, the order was logged in PCS and Riese received credit when the order was shipped. *Id.* If a partner assigned to Riese influenced the sale but was not identified on the order, then Riese was responsible for submitting a "Post-Agent Addition Form" to Lance Cannon, the Operations and Compliance Manager for the Agent team of SPO, to identify the partner associated with the order. *Id.,* ¶¶ 1, 12. Cannon reviewed the Addition forms and submitted them to the Post-Agent Program Office. *Id.* This process enabled Riese to be credited for an order if her assigned partner influenced the sale but the partner name had not appeared on the order. *Id.*

As Operations Manager, Cannon verified credit for the Agent team for orders where the partner was not identified. He did so by reviewing sales reports from HP's order management systems and the North American Sales Center Agent Reporting ("NASCAR") tool, which was an online reporting tool that provided sales reporting data. *Id.*, ¶ 13. If he located sales where no partner was identified, he sent a list of those orders to the Agent team members notifying them which orders did not have a partner attached. *Id.* If one of Riese's assigned partners influenced the sale and was not associated with the order, Riese then was responsible for submitting a Post-Agent Addition Form as described above. *Id.,* ¶ 14.

In the second half of FY08, Cannon began reviewing reports of orders placed by a company called ACS, because HP had made a deal with HP partner Agilysys to pay a commission for sales made by Agilysys to ACS. *Id.*, ¶ 15. Michael Avila was the "Alliance Manager" (a sales employee assigned to key customer relationships) for ACS. *Id.* Avila submitted monthly reports to Cannon, Riese, and others listing ACS orders that Avila had entered into HP's order management systems. *Id.* Cannon reviewed these reports to identify any sales to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                6                MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1   ACS that had been influenced by Agilysys or any other partners to which Riese's Agent team was

2   assigned to ensure that Riese and her team received credit.  *Id.*  Cannon never had reason to doubt

3   the reliability of Avila's list of orders.  *Id.*

4       Cannon also used other tools called SANDY and "Reports To Go" to regularly run reports

5   and distribute them to the Agent team to assist in the process of linking partners to orders so that

6   the Agent team would receive credit for the sales.  *Id*., ¶¶ 16, 17.  If, based on those reports, Riese

7   ever believed that she was entitled to credit for a listed order, she was required to submit a Post-

8   Agent Add Form.  *Id.*   Riese clearly understood and was adept with this process since, during her

9   employment in SPO, she frequently submitted Post-Agent Add Forms seeking credit for sales.

10  *Id.,* ¶ 20.  In 2008 alone, she submitted nearly 100 Post-Agent Adds.  *Id.,* ¶ 21.  For Post-Agent

11  Adds that met the guidelines, Cannon helped ensure that Riese was credited with all eligible sales

12  that she claimed. *Id.*

13      **D.      OMEGA's Role And Function In The Sales Compensation Architecture.**

14      In the Third Amended Complaint ("TAC"), Riese complains generally about malfunctions

15  with OMEGA—HP's incentive compensation credit and payment engine.  OMEGA's role in

16  HP's sales compensation system is as follows.  The sales compensation architecture must support

17  HP's business structure and content of individual sales plans.  Slaby Decl. ¶ 43.  For example, in

18  FY09, HP's United States operations had three Business Groups, 12 Regional Business Units; 91

19  Sales Groups; 5,042 sales reps; and 226 Sales Specialties.  *Id.*  Sources of sales data and the route

20  taken to OMEGA vary by Sales Specialty.  *Id.*  Sales data is fed into HP's sales compensation

21  process from a variety of different manual and electronic systems. *Id.*, ¶ 44; Brafford Decl., ¶2,

22  Exh. 1, Resp. No. 1.  Sales data filters through a Data Warehouse called the Sales Incentive Quota

23  Performance ("SIQP") system, which is a database that houses pre-credited sales transactions.  *Id.*

24  Sales data fed into SIQP are "enriched," meaning additional information (*e.g.*, territory, product,

25  zip code of purchaser, correct names, *etc.*) is attached so that the transaction can be credited to a

26  specific sales rep.  *Id.*  Once enriched in SIQP, the sales data is transmitted to OMEGA, the

27  crediting and payment engine that calculates the incentive compensation to be paid to each sales

28  rep.  *Id.*  OMEGA matches the sales data from SIQP to the individual sales rep who is entitled to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                    7                    MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1   be credited for that sale according to the terms of that sales representative's Sales Letter,

2   calculates the performance attainment percentage, applies that percentage to the Target Incentive

3   Amount to determine payment, nets the payment against prior payments and/or any liabilities, and

4   sends the resulting sum to payroll for payment to the employee. *Id.* Other sales bypass SIQP,

5   and the data relating to those sales is enriched through manual processes and/or other systems.

6   *Id.* For example, for some sales representatives, such as Riese in FY07-09, data on orders to be

7   credited to Riese were input manually into OMEGA. *Id.* For others, such as Riese in FY06, data

8   on orders are systemically fed into SIQP and then into OMEGA. *Id.;* Thiel Decl. ¶ 23.

9          **E.      OMEGA Supports HP's Business Requirements.**

10          HP acquired OMEGA when it acquired Compaq in 2001. Declaration of David Wood

11   ("Wood Decl.") ¶¶ 3-4. At that time, HP paid sales incentive compensation based on customer

12   *orders*, which is not optimal since orders can be cancelled or changed and the financial

13   recognition is too early. *Id.,* ¶ 4. *Shipments* are closer to the date HP receives revenue for sales.

14   *Id.* Unlike HP, Compaq already had a well-defined worldwide sales compensation model that

15   paid on orders for software and shipments for hardware using OMEGA. *Id.* HP chose to use

16   OMEGA, which was able to credit on the wide variety of HP's many different sales plans and

17   also could pay incentive compensation based on shipments. *Id.* OMEGA has undergone a

18   number of upgrades and modifications since 2002. *Id.,* ¶¶ 5-7.

19          Since 2005, HP has reviewed other systems as possible replacements for OMEGA to

20   upgrade to "state-of-the art" software and improve user interface, including systems from

21   Callidus Software, Oracle, Siebel, and SAP. Slaby Decl. ¶ 45. For example, from 2005 to 2007,

22   HP conducted a $25 million experiment with a system called TrueComp. *Id.* HP ultimately

23   rejected TrueComp because it was unable to process the volume of sales data required to support

24   HP's sales compensation process—which involved about 140 million transactions and 875

25   million credits in 2007. *Id.* Since then, HP has continually surveyed the vendor market for new

26   options. *Id.* HP's reasons for reviewing other systems do not include finding a *faster* system to

27   process sales data because OMEGA is faster than any system HP has tested or believes to be on

28   the market. *Id.* HP continues to use OMEGA because it has continued to be the best fit to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                    8                    MEMO. OF POINTS & AUTH. ISO DEF.'S
                                                                      MOTION FOR SUMMARY JUDGMENT OF
                                                                      J. RIESE'S CLAIMS (C-09-03596 CRB)

1  implement HP's business judgments about how to most effectively motivate and pay its diverse

2  sales force. *Id.*  HP has continually surveyed the market place but has chosen OMEGA as its best

3  choice for processing an enormous volume of sales data and crediting diverse set of sales plans

4  that support HP's business goals.  *Id.*

> **F.      HP Has Processes And Procedures To Ensure That Sales Representatives Are
> Paid What They Are Owed.**

7      Throughout Riese's employment and up to the present, HP's Sales Compensation IT

8  Department has had multiple processes to ensure that the sales compensation-related IT systems

9  perform correctly, that data are transmitted smoothly, and that problems are identified and

10  resolved. Wood Decl. ¶¶ 8-12.  Likewise, HP's Sales Compensation Organization ("SCO") has

11  processes to ensure that sales representatives are properly paid.  Slaby Decl. ¶¶ 46-49.  For

12  example, at the beginning of each Fiscal Year, SCO validates that the quota, assignment, Sales

13  Letter, and credit set-up tasks have been properly performed.  *Id.,* ¶ 46.  Each pay week of the

14  month, SCO performs numerous tasks generally referred to as "pay week activities" to identify

15  and correct any errors impacting the current month's sales incentive payments. *Id.*, ¶¶ 47-48.

16  SCO also has monthly and quarterly practices to review accuracy of information connected to

17  crediting and pay and to review the effectiveness of its practices.  *Id.,* ¶ 49.  Despite HP's efforts

18  to keep the system running smoothly, issues arose when, for example, HP consolidated its data

19  warehouses in 2008 and, in 2009, there were start-up issues at the beginning of the Fiscal Year

20  that delayed quota deployment in TSG.  *Id.,* ¶ 50.  But each time issues arose, IT and SCO

21  addressed them promptly.  *Id.; see* Deposition of Jonathon Oliver 29:1-37:7, Brafford Decl. ¶ 6.

> **G.      Riese Was Paid Everything She Is Owed.**

23      In Riese's deposition, she was unable to identify any sales, transactions, orders, or deals

24  for which she was improperly denied credit or any bonuses that she was denied.  Riese Depo.

25  178:12-22, 186:6-9.  She testified that, to potentially identify any such transactions, she would

26  need "to see OMEGA" or OMEGAOnline (though she's unsure what she would want to see) and

27  she would want her company laptop.  *Id.,* 179:12-182:18.  Her laptop was recycled after her

28  departure from HP in February 2009 (six months before the lawsuit was filed) and is no longer

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

DB2/22187541.8                    9

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1    available.  Declaration of Michael Menz ¶ 2.  As to OMEGA information, HP has produced

2    reports to Riese from OMEGAOnline ("OOL") and HP's intranet identifying all of the

3    transactions for which she was credited.  Brafford Decl., ¶¶ 19-20.  Still, she has not identified

4    any transaction for which she was not credited and paid under the terms of her Sales Letter.

5         After this lawsuit was filed, HP performed a reconciliation of Riese's incentive

6    compensation that demonstrates that she was paid all incentive compensation that she was owed

7    under the terms of her Sales Compensation Plan for each year of her employment.  Thiel Decl. ¶¶

8    5-9, Exhs. 1-2.  HP manually recalculated Riese's incentive compensation for each year of her

9    employment to determine whether she was paid for every sale for which she was credited in

10   OMEGA.  *Id.*  These manual calculations aligned with the OMEGA-generated calculations for

11   every year. *Id..*; Gomez Decl. ¶¶ 2-11.

12        HP also reviewed all Post-Agent Addition Forms submitted by Riese in FY08 to identify

13   any problems.  Declaration of Stacey Boyle ("Boyle Decl."), ¶ 8.  Stacey Boyle, Operations

14   Manager for the Agent team of SPO, compared the list of Post-Agent Adds to the FY08 credited

15   transaction reports generated by OMEGA, which show all of the orders for which Riese was

16   credited and paid in FY08.  *Id.,* ¶ 9.  Boyle determined that Riese received credit for all but eight

17   orders for which she submitted a Post-Agent Add Form.  *Id.,* ¶ 10.  He determined that she was

18   not entitled to receive credit for these eight orders under the terms of her Sales Compensation

19   Plan.  *Id.*  In Boyle's review, he did not find a single transaction that was missing or inaccurate in

20   the report of transactions credited to Riese, and she was credited for all eligible orders on the

21   Post-Agent Adds.  *Id.,* ¶ 11.

22        Based on the above analyses, the only reasonable conclusion is that Riese was credited for

23   every sale she made and was paid for every sale for which she was credited.

24   **H.      OMEGA Properly Credited Riese's Sales Transactions.**

25        HP also evaluated whether the OMEGA crediting and compensation system properly

26   credited Riese.  After this lawsuit was filed, HP's counsel retained KPMG, an advisory services

27   firm, to test whether the OMEGA crediting engines accurately determined FY08 sales credits for

28   Riese.  Declaration of Juan Gonzalez, Ph.D, ¶ 2, Exh. A.  KPMG constructed a model of the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8        10        MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

OMEGA crediting system that replicated the OMEGA system in effect at HP in FY08, and included in that system the various metrics and terms set forth in Riese's FY08 Sales Letter.  *Id.*, ¶ 2, Exh. A.  It then ran the 2008 sales data for Riese through that crediting engine—just as if it were manually fed into OMEGA in 2008—and calculated Riese's sales compensation based on the metrics in her individual Sales Letter.  *Id.*  KPMG also constructed an OMEGA compensation model that used its crediting calculations in the sales plan metrics.  *Id.*  It then compared the compensation results of its model against Riese's sales compensation in 2008 for OMEGA's calculation.  *Id.*  Based on this testing, KPMG determined that the OMEGA crediting and compensation engine works accurately—*i.e.*, it accurately calculated and paid Riese's incentive compensation system for FY 2008.  *Id.*

## I. Riese Had Access To Her Crediting Information And To Mechanisms To Raise Issues About Missing Credit.

During Riese's seven years of employment with HP, she had ample opportunity and tools to review her credits and identify any issues—and was required by Policy to review sales crediting on a monthly basis and report any issues.  Slaby Decl. ¶¶ 34, 35.  Riese had access to monthly "Global Incentive Statements" ("GIS") generated by OMEGA (and accessible via HP's intranet OOL) that reflected the total amount for which she had received credit for each metric under her sales specialty for each plan period as well as her incentive compensation for each sales specialty, and any bonuses, both new in the month and period-to-date.  *Id.* ¶ 35.  Riese also had access to all of her credited transaction detail that was posted in OOL.  Riese Depo. 99:13-100:14.  Once she received her paycheck, she could determine if the amount of incentive compensation paid matched the amount for which she should have received credit in accordance with her individual GIS that appeared on OOL.  Slaby Decl. ¶ 35.   Riese also viewed NASCAR-generated sales reports and requested sales reports from her Alliance Managers.  Riese Depo. 146:8-147:4.  Despite having had access to multiple sources of sales data during her employment, Riese's pleadings and discovery responses did not identify a single missing order or inaccurate crediting.

In addition, during the time that she was in SLED, Riese was supposed to utilize Siebel, a Customer Relationship Management system, to log and track potential sales.  Declaration of

Benjamin Harris ¶ 3.  Sales representatives log potential sales as an opportunity in Siebel and later indicate if the sale closed.  *Id.*  If Riese kept Siebel up-to-date for her sales, then she could refer to her closed sales on Siebel to help identify if any sale was missing in OMEGA.  *Id.*  Sales representatives in SLED could also utilize a reporting tool called Enterprise Data Warehouse to access information about all sales to a specific account.  *Id.* ¶ 4.

If Riese had noticed any credit issue during her employment, she was required to submit a Manual Claim or otherwise report it to SCO or her manager.  Slaby Decl. ¶¶ 41-42.  The Post-Agent Add process described above was separate from the Manual Claims process, through which Riese could report any kind of potential missing credit.  Boyle Decl. ¶ 4.  A "Manual Claim" is the procedure used by sales representatives to identify any instance where they believe they were not properly credited for a sale under the terms of their Sales Compensation Plans or to seek credit for a sale by an HP partner that does not report sales data to HP.  Slaby Decl. ¶ 37.  Claims may be made via an Intranet website to SCO or to a Sales Compensation Specialist (whose sole job is to interface with sales reps and help with incentive compensation issues).  *Id.,* ¶ 38.  Criteria that the sales representative must meet for approval of a Manual Claim are set out in the Sales Credit Policy, including the requirement that all claims must be submitted by a published deadline and that monetary thresholds may apply.  *Id.*

Riese submitted only one manual claim during the entire course of her employment. Riese Depo 115:2 - 117:16; Thiel Decl.¶ 25.  On October 27, 2008, she submitted a claim to her Sales Compensation Support Specialist.  *Id.*  Riese submitted three invoices asking to receive credit for transactions relating to the Erie account.  *Id.*  One of the invoices already was in the process of crediting.  *Id.*  The other two had not been associated with the Erie account.  Riese's SCO approved her claim on November 25, 2008.  *Id.*  Overall, Riese believed that HP did its "best…to ensure that everyone gets credit fairly."  Riese Depo. 85:3-5.

## II.    ARGUMENT

### A.    Summary Judgment Standard.

To satisfy its burden on summary judgment, it is sufficient for HP to point to an absence of evidence supporting an essential element of Riese's claims.  *See Celotex Corp. v. Catrett*, 477

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                12                MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1   U.S. 317, 325 (1986); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000)

2   ("showing" requires no more than "pointing out through argument" the absence of evidence). A

3   failure of proof of an essential element "renders all other facts immaterial." *Celotex*, 477 U.S. at

4   322.  Thus, HP can succeed without presenting any evidence at all. *Id.* at 323.

5        Riese may not defeat summary judgment merely by asserting conclusory statements or

6   discrediting HP's evidence. Fed. R. Civ. P. 56(e). Pointing to a "mere scintilla" of evidence also

7   is not sufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rather, Riese "must

8   present affirmative evidence." *Id.* at 257.  "This is true even where the evidence is likely to be

9   within the possession of the defendant, as long as the plaintiff has had a full opportunity to

10   conduct discovery." *Id.* A claim of "insufficient knowledge" is not enough to avoid summary

11   judgment. *Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313, 317 n.2 (C.D.

12   Cal. 2004).  As established below, Riese cannot present specific admissible evidence that

13   establishes the essential elements of her claims.

14        **B.        Riese's Breach Of Contract Claim Fails As A Matter Of Law.**

15        In the First Claim, Riese alleges that HP breached the contract governing her incentive

16   compensation by failing to pay her all that she was owed.  Riese bears the burden of proving each

17   element of her breach of contract claim under Colorado law. *Western Distrib. Co. v. Diodosio*,

18   841 P. 2d 1053, 1058 (Colo. 1992).[3]  A claim of breach of contract has three elements: (1) the

19   existence of a contract; (2) performance by the plaintiff, (3) failure to perform the contract by the

20   defendant, and (4) resulting damages to the plaintiff. *Id.*  A three-year statute of limitations

21   applies to contract claims under Colorado law. Colo. Rev. Statute § 13-80-101(1)(a).  Because

22   Riese filed her original Complaint on August 6, 2009, any alleged breaching conduct prior to

23   August 6, 2006 is irrelevant to Riese's claim.

24        Courts evaluating contractual entitlement to incentive pay "can act only upon the contract

25   _____

26   3   Because subject matter jurisdiction is based on diversity, California's choice-of-law rules
         govern. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Under those
         rules, Colorado substantive law applies to Riese's common law claims because Riese's
27       performance was in Colorado.  Cal. Civ. Code § 1646 (a contract is to be interpreted
         according to the law and usage of the place where it is to be performed or where it is made);
28       *see Arno v. Club Med Inc.*, 22 F.3d 1464, 1469 n.6 (9th Cir. 1994).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                    13                MEMO. OF POINTS & AUTH. ISO DEF.'S
                                                    MOTION FOR SUMMARY JUDGMENT OF
                                                    J. RIESE'S CLAIMS (C-09-03596 CRB)

which the parties made." *Fontius Shoe Co. v. Lamberton*, 78 Colo. 250, 241 P. 542 (1925) (enforcing forfeiture provisions of bonus contract even that "seem harsh" because "we can act only upon the contract which the parties have made"); *see also Barnes v. Van Schaack Mortg., a Div. of Van Schaack and Co.,* 787 P.2d 207. 209 (Colo. Ct. App. 1990) (rules of contract interpretation required enforcement of clear contractual language that plaintiff was not entitled to receive incentive fee commissions on loan applications that he took but did not close). The language of the contract controls when incentive pay is "earned" and payable. *See Geras v. International Business Machines Corp.*, 726 F.Supp.2d 1292 (D. Colo. 2010) (no contract where handbook governing commissions said commission not earned until end of performance period, reserved right to cancel payments, and expressly disclaimed contract formation). In *Geras*, for example, the handbook governing commissions essentially stated that *no commission was earned until paid—*and *could be canceled right up to the moment of payment*. Because the commission would not exist absent the contract, the language controlled and was enforced.

Here, Riese lacks proof of a breach of a Sales Compensation Plan or resulting damages. Riese has never identified any sale for which she was improperly denied incentive pay. In the TAC, the sole allegations about Riese appear in three lines and consist of conclusory statements that "Riese sold millions of dollars in equipment and services on behalf of HP," that "HP failed to account for all Riese's sales," "failed to pay her commissions that she earned," and "failed to pay Riese bonuses to which she was entitled." TAC ¶ 5. As discussed below, Riese's discovery responses and deposition provided no more factual insight into the factual basis for her claims.

### 1. Riese Lacks Evidence That She Was Not Credited With Any Sale To Which She Was Entitled Under Her Sales Compensation Plan.

In response to HP's interrogatory asking Riese to describe the facts that constitute HP's alleged breach of contract and how the conduct damaged her personally, Riese provided only generic statements devoid of any facts. She first contends that she "was not credited with sales that should have been credited to her," and "she did not receive all of the commissions she should have." Brafford Decl. ¶ 12, Exh. 11, Resp. No. 18. She provides no factual basis for this contention, and refers to her prior response to Interrogatory No. 10. *Id.* In Nos. 10 and 11, HP

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8

14

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

asked Plaintiff to state the total amount of compensation that she believes she is owed and to provide details about the sales for which she was not credited. *Id.,* Resp. Nos. 10-11. In response, she makes only generic, conclusory statements. *Id.* She identifies one major account as Agilysys without providing any specific facts to suggest that she was denied credit related to Agilysys. Brafford Decl. ¶ 11, Exh. 10, Resp. No. 10. She states only that she "believes HP failed to properly credit myriad sales throughout her tenure at HP…" *Id.* Likewise, in her deposition, she fails to identify any sales, transactions, orders or deals for which she was improperly denied credit or any bonuses that she was denied. Riese Depo. 178:12-22, 186:6-9. With no evidence that HP denied her any incentive pay that she earned under her Sales Compensation Plans, she can prove neither that HP breached the compensation contract nor that she suffered any resulting damages. *See Scarry v. Joss,* 364 P.2d 209, 210 (Colo. 1961) (dismissing salesman's failure-to-pay commissions claim where he presented no evidence of damages and ultimately conceded that his claims were based on sales that were ineligible for commissions under the explicit terms of the written compensation plan); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 166 (9th Cir. 1989) (summary judgment for defendant on breach of contract claim because the plaintiff lacked evidence of damages).

> **2.   Riese Lacks Evidence That HP Breached Any Contractual Promise To Pay Incentive Compensation Within A Specific Time-Frame.**

Riese's discovery responses also stated that her incentive pay was *untimely*. Notably, although Riese's co-Plaintiff, James Purvis, made a specific allegation in the TAC that HP did not pay incentive pay "*timely*"(*see* TAC ¶ 8), Riese's allegations in the TAC do not mention timeliness. *See* TAC ¶ 5. Even if, nonetheless, she is permitted to proceed with such a claim, she has no proof that HP paid her "late." Indeed, Riese testified that HP did *not* commit to a time frame in which incentive pay would be paid. Riese Depo. 34:20-25, 35:10-21. She felt that, because a customer was required to pay HP within 30 days, then she also should get paid her incentives within 30 days. *Id.* at 34:1-8.

In her interrogatory responses, Riese contends (*without citation to any evidence*) that HP knew OMEGA was inaccurate and untimely, which resulted in Riese receiving commissions

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8

15

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1   more than 30 days after having "earned" them.  According to Riese, she "earned her wages when

2   they "vested," which Riese believes "took place upon the making of a sale."  Brafford Decl. ¶ 12,

3   Exhibit 11, Resp. No. 18.  In her deposition, she testified that, essentially, the minute she hung up

4   the phone with a customer, her incentive pay was "earned." Riese Depo. 36:4-16 (as soon as a

5   customer told her on the phone, via email, or via the company website that they wanted to buy a

6   product, then she was entitled to a commission).   She does not cite any document or other

7   communication from HP to support her 30-day rule, or her interpretation of when incentive pay

8   "vested."  Under the Sales Compensation Plans and governing policies, incentive pay could not

9   be earned any earlier than crediting—and occurred later in some circumstances.   Slaby Decl. ¶¶

10  29-30.  The date of a credit depended on whether the sale was a product or service and whether it

11  was direct or indirect.  *Id.*  But, in all events, crediting did not occur until all crediting data

12  reached OMEGA.  *Id.*  **HP never committed to a 30-day deadline**.  *Id.*  Once crediting occurred,

13  pursuant to Policy, HP then paid incentives in the following pay cycle. *Id.*  Payment was the

14  conditional on, for example, the non-occurrence of "negative transactions," such as order or

15  shipment cancellation.  *Id.*, ¶ 31.  Negative transactions create "incentive liability," in which case

16  the incentive payment is only a pay advance and is recoverable by HP.  *Id.*  Riese understood that,

17  if a customer returned a product, she would not get credit for the sale.  Riese Depo. 43:1-23.

18      In Fiscal Years 2007-09, the date when incentive pay could be considered "earned" was

19  affected by the 60% Performance Threshold.  Slaby Decl., ¶ 32.  No incentive pay was "earned"

20  until the end of the measure period at which time attainment of the 60% Performance Threshold

21  could be calculated.  *Id.*  In FY07 to FY09, Riese's measurement period was semi-annual.  So, for

22  example, for the first half of FY07, no incentive could be "earned" prior to the close of the

23  performance period in May, close of crediting, and calculation of the attainment of the 60%

24  Threshold.  Riese offers no evidence that she was paid "late" after the close of those periods.

25      In sum, Riese lacks evidence that HP promised to credit and pay within a specific time-

26  frame or that it failed to do so in breach of the Sales Compensation Plan.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                    16          MEMO. OF POINTS & AUTH. ISO DEF.'S
                                              MOTION FOR SUMMARY JUDGMENT OF
                                              J. RIESE'S CLAIMS (C-09-03596 CRB)

### 3. Riese Lacks Evidence That An OMEGA Malfunction Breached Any Contractual Promise And Reduced Her Incentive Pay.

As another basis for her beach of contract claim, Riese's discovery responses state that "HP used the Omega system knowing it was flawed, inaccurate, and prone to problems, and the Omega system's use resulted in Riese being underpaid and paid untimely." Brafford Decl., ¶ 12, Exh. 11, Resp. No. 18. But in response to HP's request to identify malfunctions in OMEGA that resulted in lower incentive pay or delayed incentive pay *to her*, she provided no basis for the claim. Riese stated that OMEGA "failed to accurately track all sales, credit Plaintiff for all sales, calculate and track commissions form all sales, and timely display sales, commissions, and earnings data" and, because OMEGA was used to pay her, there must be inaccuracies. *Id.*

These are just conclusions, not facts. The only "evidence" she offers that purportedly shows that she was personally injured by OMEGA is a reference to a 2009 reconciliation that occurred in a small business unit called the DesignJet group. According to Riese, the reconciliation "revealed that when HP compared actual shipment of hardware against sales that were credited, at least 10% of actual sales were never credited." *Id.* The referenced reconciliation had nothing to do with an OMEGA malfunction; it was a human quota-setting error. *See* Declaration of Michael Morton, ¶¶ 2-6. It also had nothing to do with Riese. It affected fewer than 30 people in the second half of FY09 (*after Riese resigned*) in IPG—a business unit in which Riese never worked. *Id.* In short, Riese lacks any evidence that OMEGA ever malfunctioned in a way that negatively impacted her incentive pay.

### 4. Riese Lacks Evidence That The Manual Claims Process Breached Any Contractual Promise Or Resulted In Any Loss Of Incentive Pay.

As a fourth basis for her contract claim, Riese states that, "HP also implemented a manual claims process that was so complicated, restrictive (*i.e.*, containing restraints on the timeframe for submitting manual claims), and cumbersome that it was, as a practical matter, impossible for a sales representative to obtain all of the commissions to which she was entitled." Brafford Decl. ¶12, Exh., Resp. No. 18. The mechanics and criteria for manual claims could be of no surprise to Riese: They are contained in the Sales Compensation Policy. Further, in her deposition, Riese testified that she believed she had submitted manual claims when she noticed that an order was

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8

17

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1  not properly credited to her, but does not recall how many, who handled them, or anything about

2  them.  Riese Depo. 115:11-117:16.  HP has evidence of one Manual Claim submitted by Riese,

3  which was approved.  She offers no evidence that she had difficulty using the Manual Claims

4  process, that the Manual Claims process prevented her from full payment, or that HP's use of the

5  process breached the Sales Compensation Plan in some way.

6          For all of the reasons above, Riese lacks even a scintilla of proof that HP deprived her of

7  any earned incentive pay under the terms of her Sales Compensation Plans.  Consequently,

8  summary judgment is warranted.

9      **C.      Riese's Breach Of The Implied Covenant Of Good Faith And Fair Dealing
               Claim Fails As A Matter Of Law.**

10         In the First Claim, Riese also claims a breach of the implied covenant of good faith and

11  fair dealing—which is similarly devoid of any factual basis. TAC ¶ 71. The three-year statute of

12  limitations governs Riese's contractual good faith claim.  Colo. Rev. Statute § 13-80-101(1)(a).

13  The claim of breach of good faith and fair dealing did not appear in Riese's pleadings until she

14  filed her Third Amended Complaint on July 21, 2010. Consequently, only alleged conduct

15  occurring after July 21, 2007 is relevant to this claim.

16         Under Colorado law, the duty of good faith applies when one party is given discretionary

17  authority to determine certain terms of the contract. *Amoco Oil Co. v. Ervin*, 908 P. 2d 439, 498

18  (Colo. 1999). The implied duty "may not contradict terms or conditions for which the parties have

19  bargained." *Lufti v. Brighton Community Hosp. Ass'n,* 40 P.3d 51, 59 (Colo.App. 2001).  Nor

20  can it inject new substantive terms into the contract. *Cobank v. Reorganized Farmers*

21  *Cooperative Ass'n*, 170 Fed. Appx. 559, 565 (10th Cir. 2006) (applying Colorado law); *see*

22  *Woods v. National Medical Care,* 25 Fed.Appx. 767, 772 (10th Cir. 2001).

23         The question of good faith "is determined on a case-by-case basis." *Cobank,* 170 Fed.

24  Appx. at 565.  A "breach may occur when one party uses discretion conferred by the contract to

25  act dishonestly or to act outside of accepted commercial practices to deprive the other part of the

26  benefit of the contract." *Id.*

27         Here, the TAC provides absolutely no factual basis as to how HP allegedly breached its

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                    18                    MEMO. OF POINTS & AUTH. ISO DEF.'S
                                                                       MOTION FOR SUMMARY JUDGMENT OF
                                                                       J. RIESE'S CLAIMS (C-09-03596 CRB)

duty of good faith to Riese.  The sole allegation about good faith reads as follows: "HP engaged in conduct, separate and apart from its performance of obligations under its employment contract, without good faith and for the purpose of depriving the Employees and Class Members, of rights and benefits under their employment contract."  TAC ¶ 71.   In her discovery responses, Riese contends that HP's compensation system "was so complex, and so convoluted," that (a) sales representatives could not easily obtain all incentive pay, (b) sales incentives were deferred and delayed, (c) HP used OMEGA knowing that OMEGA was "defective and undercompensated its sales representatives," and (d) HP failed to commit the resources necessary to fix or replace the OMEGA system.  Brafford Decl. ¶12, Exh, 11, Resp. No. 19.  These allegations cannot form the basis of a claim for breach of good faith for multiple reasons.

First, as noted above, Riese lacks any evidence that the "complexity" of the system or an OMEGA malfunction prevented her from being paid everything she was owed.  Further, under the guise of good faith, Riese is not permitted to inject new terms or alter existing terms in the Sales Compensation Plans or Sales Compensation Policy.   The sales compensation structure and use of OMEGA were not addressed in the contract as subject matters about which HP had "discretion," and, therefore, the doctrine of good faith does not even apply.  Riese is not permitted to challenge HP's strategic business decisions about its sales compensation practices that are not governed by the contract.  For example, Riese appears to make the incredible argument that, to satisfy its duty to her, HP must simplify its compensation system and replace OMEGA. HP is not aware of any legal authority in which the implied covenant of good faith has been used as the basis for compelling a company to construct a particular kind of sales compensation system or other business system to satisfy its contractual duty of good faith to an employee.  *Cf. Brill v. Lante Corp.*, 119 F.3d 1266, 1272 (7th Cir. 1997) ("Courts refuse to sit in judgment as super-personnel departments overseeing corporate decisions ..."); *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Serv.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (emphasizing that a court's "role is to prevent unlawful…practices, not to act as a 'super personnel department' that second-guesses employers' business judgments").  Riese's request here for such extraordinary intervention into corporate operations and budgets should be denied.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                        19                     MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

### D.     Riese's Claim For Unjust Enrichment Fails As A Matter Of Law.

In the "Second Claim For Relief," Riese asserts a claim of unjust enrichment as an alternative to the contract claim.  A three-year statute of limitations applies to this claim. *See Tennille v. Western Union Co.*, __F. Supp. 2d__, 2010 WL 4609732, at *3 (D. Colo., Nov. 8, 2010).  The unjust enrichment claim appeared in the original Complaint filed on August 6, 2009, and, therefore, only alleged conduct occurring after August 6, 2006 is relevant.

Unjust enrichment is an equitable claim based on a quasi-contract theory implied by law that does not rely upon a promise between parties.  *Harris Group, Inc. v. Robinson,* 209 P. 2d 1188, 1205 (Colo. App. 2009).  There are three elements of the claim: (1) at the expense of a plaintiff; (2) a defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it.  *Robinson v. Colo. State Lottery Div.,* 179 P.3d 998, 1007 (Colo. 2008).  Because the claim is equitable, it is not allowed when an adequate remedy at law exists.  *Id.* at 1007.  Specifically, a party cannot recover under a quasi-contract theory (or any other equitable theory) "when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."  *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App.2003).  Whether unjust enrichment has occurred requires a case-by-case evaluation of the facts.  *Redd Iron, Inc. v. International Sales and Services Corp.*, 200 P.3d 1133, 1136 (Colo. Ct. App. 2008).

Here, in support of her claim, Riese again asserts no facts.  Rather, she contends that, "[d]espite requests and demands, HP has failed and refused to pay, and pay timely, for the benefits it received from the Employees… including but not limited to sales revenues generated by Plaintiffs."  TAC ¶ 76.  Because her claim of breach of contract for unpaid incentive pay covers the same subject matter as the unjust enrichment claim, she has an adequate remedy at law.  The unjust enrichment claim should be dismissed for this reason alone. The claim also fails because Riese cannot satisfy her burden to show that HP received an *unjust* benefit from Riese's sales activities.  The mere allegation of failed performance of a contract is not sufficient to show unjust enrichment.  *Redd Iron,* 200 P.3d at1138 (citing Restatement of Restitution § 110).  Because it is undisputed that, in compensation for Riese's services, HP paid Riese a base salary

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                    20

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1    and incentive pay in every year of her employment, she lacks evidence sufficient to support an

2    unjust enrichment claim.  Summary judgment is warranted.

3         **E.      Riese's Promissory Estoppel Claim Fails As A Matter of Law.**

4         In the Third Claim for Relief, Riese asserts a claim of promissory estoppel as an

5    alternative to her contract claim. A promissory estoppel claim substitutes for a contract claim

6    where, for example, the element of consideration is lacking.  *Vigoda v. Denver Urban Renewal*

7    *Authority*, 646 P.2d 900, 905 (Colo. 1982).  Detrimental reliance replaces the element of

8    consideration.  *Id.*  There are four elements of the claim:  (1) a promisee; (2) the promisor should

9    reasonably have expected that the promise would induce action or forbearance; (3) the promisee

10   in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be

11   enforced to prevent injustice.  *See Nelson v. Elway*, 908 P.2d 102, 110 (Colo.1995); Restatement

12   (Second) Contracts § 90.  A three-year statute of limitations applies to promissory estoppel

13   claims.  *Stearns Management Co. v. Missouri River Services, Inc.,* 70 P. 3d 629, 632 (Colo. Ct.

14   App. 2003).  Because this claim appeared in the original Complaint filed on August 6, 2009, only

15   alleged conduct that occurred after August 6, 2006 is relevant.

16        Here, as the basis for the promissory estoppel claim, Riese alleges that HP "made a clear

17   and definite promise that the Employees…would be paid commissions and bonuses on sales made

18   by them on behalf of HP" and that Employees would be "paid specified amounts of commissions

19   and bonuses on sales within their territories."  TAC ¶¶  83-84.  As detrimental reliance, she

20   alleges that she continued to work for HP.  TAC ¶ 86.  But HP has not argued that the Sales

21   Compensation Plan does not constitute a contract due to lack of consideration or any other basis.

22   Therefore, there is no reason to resort to a promissory estoppel claim. Further, for the following

23   reasons, Riese lacks evidence to prove the claim.

24        First, Riese's continued employment with HP did not constitute "detrimental" reliance.

25   Riese testified that she first believed that HP was not paying her accurately shortly after her

26   employment began in 2002.  Yet Riese testified that she did not consider any outside job

27   opportunities until she learned that the Colorado Springs operations where she worked would be

28   relocating to New Mexico. Riese Depo. pp. 185:14-186:5.  In short, she did not reject any specific

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                                21          MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1  job offer, allegedly in reliance on HP's promises about her incentive compensation.  In this

2  context, her seven years of continued employment do not constitute detrimental reliance as a

3  matter of law.  *See Oracle Corp. v. Falotti*, 187 F.Supp.2d 1184, 1206-07 (N.D.Cal. 2001)

4  (California law) (reliance upon employer's alleged promise of continued employment was not

5  detrimental, since executive did not receive any outside job offers since time of alleged promise);

6  *National Medical Care, Inc.* 25 Fed. Appx. 767, 773 (10th Cir. 2001) (New Mexico law)

7  (granting summary judgment on promissory estoppel claim because continued

8  employment/refraining from a job search was not proof of detrimental reliance where "the

9  plaintiffs do not indicate that they forfeited specific employment opportunities in expectation of

10  additional bonuses").

11  Second, Riese could not have reasonably relied on any communication that suggested she

12  would be paid anything other than what was set forth in the Sales Compensation Plans each year.

13  *See, e.g., Lufti,* 40 P.3d 51 (summary judgment on promissory estoppel claim sustained after

14  finding that plaintiff could not have reasonably relied on any promises that contradicted the terms

15  of the parties' written agreement); s*ee also Woods,* 25 Fed. Appx. at 773.

16  For all these reasons, summary judgment is warranted on her promissory estoppel claim.

17  **F.  Riese's Claim For Penalties For Failure To Pay All Wages Due At The Time
         Of Termination Under Col. Rev. Stat. 8-4-109 Fails As A Matter Of Law.**

18

19  In the Twelfth Claim, Riese asserts two different claims under the Colorado Wage Act—

20  one under Colo. Rev. Stat §. 8-4-103 and one under Colo. Rev. Stat. § 8-4-109.  Section 8-4-103

21  is address below.  Under § 8-4-109, Riese seeks unpaid wages and statutory penalties based on

22  the allegation that, when she voluntarily resigned in February 2009, HP failed to timely pay her

23  all earned wages.  TAC ¶¶ 154-156.  Under Colo. Rev. Stat. § 8-4-109(1)(b), resigning employees

24  must be paid all wages due by the "next regular payday."  Only wages that have been fully earned

25  under the compensation agreement must be paid by that deadline. Colo. Rev. Stat. § 8-4-109(2).

26  Here, Riese has not identified any wages not paid after her termination and still owed to her.

27  As to statutory penalties for delay, if HP had failed to fully pay Riese by the next regular

28  payday after her resignation, then it could potentially have been liable for statutory penalties. *See*

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Palo Alto

DB2/22187541.8          22          MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1  Colo. Rev. Stat. § 8-4-109(3).  To trigger penalties, however, Riese was required to make a

2  written demand for payment on HP within 60 days after her departure if she did not think her last

3  paycheck was complete.  Colo. Rev. Stat. § 8-4-109(3)(a) &(d).  After Riese's resignation in

4  February 2009, however, HP did not hear from Riese again until she filed this lawsuit in August

5  2009—six months after her employment ended.  Thus, even if the lawsuit could substantively

6  satisfy the "written demand" requirement, it was not made within 60 days and, therefore, she is

7  not entitled to any statutory penalties under § 8-4-109(3).

8      **G.    Riese's Claim That HP Failed To Timely Pay Her Incentive Pay During The
         Course Of Her Employment In Violation Of Colo. Rev. Stat. § 8-4-103 Fails

9         As A Matter Of Law.**

10         Under the Twelfth Claim, Riese also asserts a claim under Colo. Rev. Stat. § 8-4-103.

11  Consistent with the rest of the TAC, Riese does not include a single fact about herself. Instead,

12  she generally asserts that, during the course of their employment, HP permitted Colorado

13  employees "to perform work for the benefit of HP without being paid the wages owed them in a

14  timely manner as required by Colo. Rev. Stat. § 8-4-103(1)(a)."  *See* TAC ¶¶ 157-160.  Under this

15  provision, "earned" wages are to be paid to employees within 30 days, on regular paydays, unless

16  the employee and employer mutually agree to an alternative pay schedule. Colo. Rev. Stat. § 8-4-

17  103(1)(a).  Summary judgment is warranted on this claim for four reasons.

18         First, Colo. Rev. Stat. § 8-4-103(1)(a) provides ***no private right of action or remedy*** for

19  alleged "late" wage payments during the term of an employee's employment.  The Colorado

20  Wage Act's only penalty provision for private parties is § 8-4-109, which applies only to

21  *terminated* employees. *See Farris v. ITT Cannon, a Div. of ITT Corp.,* 834 F.Supp. 1260 (D.Colo.

22  1993) ("Section 8-4-104 clearly and unambiguously provides that it only applies to employees

23  whose wages are withheld after their employment terminates. Since this statute must be applied as

24  written, § 8-4-104 fails to offer any relief to employees whose wages are withheld while they are

25  still employed."); 16 COLO. PRAC. EMPLOYMENT LAW & PRACTICE § 7.58 (2d ed. 2010) ("The

26  penalty for refusing to pay wages applies only to compensation due former employees; current

27  employees may not seek the statutory penalty for wages wrongfully withheld during their

28  employment.").  Summary judgment is required for this reason alone.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)

1    <u>Second</u>, Riese was not paid "late."  Under the Colorado Wage Act, commissions and

2    bonuses are deemed "wages" only when, in accordance with the applicable employment

3    agreement, the amount "is earned, vested, and determinable."  Colo. Rev. Stat. § 8-4-101(8)(a).

4    As explained above, Riese lacks evidence of any instance that HP paid her incentive

5    compensation more than 30 days after it was earned under the Sales Compensation Plan.

6        <u>Third</u>, the Sales Compensation Plan constituted a mutual agreement between employee

7    and employer as to how and when sales would be credited.  The Sales Compensation Policy and

8    Sales Credit policy stated that HP would pay incentive compensation in the pay cycle following

9    crediting.  Slaby Decl. ¶ 27.  By agreeing to the Sales Compensation Plan, Riese agreed to be

10   governed by the Plan and not the 30-day provision in Colo. Rev. Stat. § 8-4-103(1)(a).

11       <u>Fourth</u>, if there were any penalty for such alleged "late" payments, the Colorado Wage

12   Act's two-year statute of limitation should bar recovery for any period prior to July 21, 2008.  *See*

13   Colo. Rev. Stat. § 8-4-126 (two year limitation period for all Wage Act claims).  This is so

14   because Riese's pleadings did not add the claim under Colo. Rev. Stat. § 8-4-103(1)(a) until July

15   21, 2010 when she filed the Third Amended Complaint.  Thus, the two-year statute of limitations

16   extend back only to July 21, 2008.  Because she proffers no evidence of a "late" payment within

17   that time period (or any other time period), the claim should be dismissed.

18       For these reasons, Riese's claim of "late" payment of incentive pay fails entirely, and at

19   the very least, should not extend back further than July 21, 2008.

20   **H.      Riese's Claim For Improper Deductions In Violation Of The Colorado Wage**
         **Act Fails To Create A Triable Issue.**

21

22       In the Thirteenth Claim for Relief, Riese alleges that "HP violated [Colo. Rev. Stat. § 8-4-

23   105] as to the Colorado Employees…whose wages have been reduced or not paid by HP in that

24   they did not receive their full earned commissions and bonuses from HP."  TAC ¶ 168. Colo.

25   Rev. Stat. § 8-4-105 states that "no employer shall make a deduction from the wages or

26   compensation of an employee" except for certain itemized statutory deductions.  Again, Riese

27   does not identify any specific facts as to how HP took improper deductions from her pay.  The

28   generic allegation simply refers to the general allegation that HP failed to pay her all earned

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8                          24         MEMO. OF POINTS & AUTH. ISO DEF.'S
                                                   MOTION FOR SUMMARY JUDGMENT OF
                                                   J. RIESE'S CLAIMS (C-09-03596 CRB)

1   incentive pay.  Thus, Riese lacks any evidence that HP failed to pay her all earned wages.  For all

2   of the reasons above, summary judgment is warranted on this claim too.

3       **I.      Riese's Claim For An Accounting Fails To Raise A Triable Issue.**

4         The final Claim for Relief is for an accounting.  A prerequisite to the right to maintain an

5   equitable claim for accounting is the absence of an adequate remedy at law.  *American*

6   *Woodmen's Life Ins. Co. v. Supreme Camp of Am. Woodsmen,* 549 P. 2d 423, 426-27 (Colo. App.

7   1976) (a party is not "entitled to an accounting as of course"); *Bradshaw v. Thompson*, 454 F.2d

8   75, 79 (6th Cir. 1972) ("[a]n accounting is a species of disclosure," is "an extraordinary remedy,"

9   and "like other equitable remedies, is available only when legal remedies are inadequate").

10        Here, Riese has adequate legal remedies.  She has alleged multiple claims for relief for

11  breach of contract and violation of the Colorado Wage Act.  *Harris v. Thompson,* 156 P. 149, 151

12  (Colo. 1916) (defendant could not turn a legal contract claim into an equitable one merely by

13  alleging a claim for "accounting"). To the extent she is able to prove liability under any theory,

14  she has an adequate remedy at law.  Summary judgment is warranted.

15  **III.    CONCLUSION**

16        For the foregoing reasons, HP respectfully requests that this Court grant its Motion for

17  Summary Judgment and dismiss Riese's Third Amended Complaint it its entirety.

18

19  Dated: February 4, 2011            MORGAN, LEWIS & BOCKIUS LLP
20                             ANNE M. BRAFFORD

21                      By   /s/Anne M. Brafford
22                         Anne M. Brafford
                           Attorneys for Defendant
23                         HEWLETT-PACKARD COMPANY

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22187541.8         25      MEMO. OF POINTS & AUTH. ISO DEF.'S
MOTION FOR SUMMARY JUDGMENT OF
J. RIESE'S CLAIMS (C-09-03596 CRB)