# EXHIBIT "K"

1  ROBERT J. SMITH, D.C. State Bar No. 162784
   *Admitted Pro Hac Vice*
2  MELINDA S. RIECHERT, Cal. State Bar No. 65504
   ANNE M. BRAFFORD, Cal. State Bar No. 237574
3  MORGAN, LEWIS & BOCKIUS LLP
   2 Palo Alto Square
4  3000 El Camino Real, Suite 700
   Palo Alto, CA  94306-2122
5  Tel:  650.843.4000
   Fax:  650.843.4001
6  E-mail:   rsmith@morganlewis.com
                 mriechert@morganlewis.com
7                 abrafford@morganlewis.com

8  RICHARD W. BLACK, D.C. State Bar No. 467982
   *Admitted Pro Hac Vice*
9  BARBARA I. ANTONUCCI, Cal. State Bar No. 209039
   LITTLER MENDELSON
10 A Professional Corporation
   650 California Street, 20th
11 San Francisco, CA  94108-2693
   Tel:  415.433.1940
12 Fax: 415.399.8490
   E-mail:  rblack@littler.com
13                 bantonucci@littler.com

14 Attorneys for Defendant
   HEWLETT-PACKARD COMPANY
15

16                 UNITED STATES DISTRICT COURT
17           FOR THE NORTHERN DISTRICT OF CALIFORNIA
18

19
   JEFFREY JOHNSON, JENNIFER RIESE,          Case No. C-09-03596 CRB
20 SHAUN SIMMONS and JAMES PURVIS,
   individually, and on behalf of others      **DECLARATION OF ROBERT SLABY IN**
21 similarly situated,                        **SUPPORT OF DEFENDANT HEWLETT-**
                                              **PACKARD'S MOTION FOR SUMMARY**
22                 Plaintiffs,                **JUDGMENT**

23              vs.                           Date:        March 4, 2011
                                              Time:        10:00 a.m.
24 HEWLETT-PACKARD COMPANY and               Dept.:       Courtroom 8
   DOES 1-25 inclusive,                       Judge:       Hon. Charles R. Breyer
25
                 Defendants.
26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                DECL. OF ROBERT SLABY IN SUPPORT OF
                              DEFENDANT'S MOTION FOR SUMMARY
                              JUDGMENT (CASE NO. C-09-03596 CRB)

1  **DECLARATION OF ROBERT SLABY**

2  I, Robert Slaby, do hereby declare:

3       I have personal knowledge of the facts set forth in this declaration and, if called upon to

4  do so, could and would testify competently thereto.

5       1.    I am currently employed by Hewlett-Packard ("HP") as a Director of Sales

6  Operations in the Sales Compensation Operations Department ("SCO").  I have held this position

7  since October of 2005. I have worked for HP since March of 1998.

8       2.    SCO is responsible for administering the sales compensation process at HP.

9  **Hewlett-Packard's Organizational Structure For Sales Representatives**

10       3.    HP is a tech company with world-wide operations offering hardware, software,

11  services, and support to consumers, businesses, government agencies, and educational

12  institutions.  HP's sales force is organized around these products and services by Business Group.

13  During the relevant time period, the names of HP's three Business Groups were the Technology

14  Solutions Group ("TSG"), which later became the Enterprise Business Group ("EB"), the

15  Imaging and Printing Group ("IPG"), and the Personal Systems Group ("PSG"). Generally, TSG

16  focused on business products and services including servers, storage software, consulting, and

17  support; PSG focused on business and consumer personal computers, mobile computing devices,

18  and workstations; and IPG focused on inkjet, LaserJet and commercial printing, and printing

19  supplies.

20       4.    During the relevant period, Plaintiffs Riese and Johnson worked only in PSG.

21  Plaintiffs Simmons and Purvis worked in TSG.

22  **HP's Sales Compensation Policies**

23       5.    The named Plaintiffs' incentive compensation was governed by their Sales Letters

24  and their Credit and Compensation Plans (which changed yearly) and also by HP's sales

25  compensation policies.

26       6.    HP's policy documents that are collectively referred to as the "Sales Compensation

27  Policy" in this Declaration have changed over time since 2006, including changes in name, some

28  content changes, and changes to consolidate multiple, free-standing policies into a single policy.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

1

1   Generally, the Sales Compensation Policy sets forth the details of the incentive pay process at HP.

2   An accurate summary of the policy name changes and structure changes is attached as Exhibit 1.

3         7.     True and correct copies of the HP Sales Compensation Policies in effect from

4   FY06 to FY09 are attached as Exhibit 2 to 6:

5   ▪  Exhibit 2: FY06 FY North American Sales Compensation Incentive Pay Administration

6      Policy, effective 11-1-05, HP00007761-793.

7   ▪   Exhibit 3: FY06 Global Sales Compensation Incentive Pay Administration Policy, effective

8      5-1-06, HP00000414-443.

9   ▪  Exhibit 4: FY07 HP Global Sales Compensation Policy, effective 11-1-06, HP00000546-570.

10  ▪  Exhibit 5:  FY08 HP Global Sales Compensation Policy, effective 11-1-07, HP00000648-673.

11  ▪  Exhibit 6: FY09 HP Global Sales Compensation Policy, effective 11-1-08, HP00000813-836.

12

13        8.     The Sales Compensation Policy in each relevant year stated the following: "No

14  Sales Plan participant will have any right to monies accrued through the plan until and unless all

15  terms, provisions, and conditions as set forth in the assigned Sales Plan have been met."  This

16  language is reflected on the following pages of the Policy: FY06 FY North American Sales

17  Compensation Incentive Pay Administration Policy, effective 11-1-05, p. iv., HP000007761;

18  FY06 Global Sales Compensation Incentive Pay Administration Policy, effective 5-1-06, p. 4,

19  HP00000417; FY07 HP Global Sales Compensation Policy, effective 11-1-06, p.3, HP00000548;

20  FY08 HP Global Sales Compensation Policy, effective 11-1-07, p.4, HP00000651; FY09 HP

21  Global Sales Compensation Policy, effective 11-1-08, p. 5, HP00000818.

22        9.     The Compensation Policy also states that any exceptions to the Policy "must be

23  approved" (in FY06) or "must be approved in writing" (in FY07-FY09).  This language is

24  reflected on the following pages of the Policy: FY06 North American Sales Compensation

25  Incentive Pay Administration Policy, p. 5, HP00007765;  FY07 HP Global Sales Compensation

26  Policy, effective 11-1-06, p. 1, HP00000546; FY08 HP Global Sales Compensation Policy, p. 2,

27  HP00000649; FY09 HP Global Sales Compensation Policy, effective 11-1-08, p. 2, HP00000815.

28        10.    The documents that are collectively referred to in this Declaration as the "Sales

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6

2

DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

Credit Policy" also have changed over time since 2006. The Sales Credit Policy is tailored to explaining how sales credit is posted and applied for those sales representatives who have a sales quota. An accurate summary of the policy name changes and structure changes is attached as Exhibit 1.

11.     True and correct copies of the HP Sales Credit Policies in effect from FY06 to FY09 are attached as Exhibit 7 to 10:

- Exhibit 7: FY06 North American Sales Credit Implementation Guide, effective 11-1-05, HP00000308-327.
- Exhibit 8: FY07 Americas Sales Compensation Operations U.S. & Canada Sales Compensation Implementation Guidelines, effective 11-1-06, HP00000883-897.
- Exhibit 9: FY08Americas Sales Compensation Operations U.S. & Canada Sales Compensation Handbook, effective 11-1-07, HP00000898-908.
- Exhibit 10: FY09 Americas Sales Compensation Operations U.S. & Canada Sales Compensation Handbook, effective 11-1-08, HP00000909-920.

12.     During the relevant time period, SCO distributed its sales compensation-related policies to the sales representatives electronically. The policies were also available to the sales representatives on the Americas SCO Website.

**Sales Representatives' Individual Sales Letters And Credit & Compensation Plans**

13.     At HP during the relevant period, some sales representatives were assigned to quota-carrying incentive compensation plans. For these sales representatives, a sales quota is established at the beginning of the individual's performance period. On a quota carrying plan, the incentive compensation may be determined by calculating the percentage of the quota met by the sales credited to the sales representative and applying that percentage to the Target Incentive Amount ("TIA"). The incentive compensation calculation will also consider other factors, such as accelerators (multipliers) for performance attainment above 100%.

14.     Other sales representative are compensated according to sales plans that do not carry a quota, but rather calculate incentive compensation based on the sales representative's achievement of performance measures established by the sales representative's manager. The

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6          3          DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1   performance of the sales representatives on these non-quota carrying plans may be entirely

2   discretionary.

3          15.    For example, under a "Focused Sales Objective" ("FSO") plan, incentive

4   compensation is not always measured by sales credit metrics. Rather, objectives under FSOs are

5   established by managers. An FSO is a strategic performance measure, as defined in sales

6   employee's Sales Plan, used to address a complex selling environment with multiple and varied

7   objectives.  Measures typically involve product mix, customer mix, number of new accounts, or

8   other measurable goals.  Sales managers are responsible for defining FSOs for sales employees

9   assigned to Sales Plans with FSO performance measure, in collaboration with the employee and

10  Sales Incentive Design Business Group Manager at the beginning of the performance period.  The

11  following pages of the Policy describe FSOs: FY06 North America Sales Compensation Incentive

12  Pay Administration Policy, effective p. 7, HP00007767; FY06 Global Sales Incentive Pay

13  Administration Policy, effective 5-1-06, p.13, HP00000426.  Incentive pay under an FSO is not

14  payable until the manager determines the extent to which the sales representative met the

15  objectives of the plan.  Under the terms of some FSO plans, the amount of incentive

16  compensation is also within the sole discretion of the manager.  If the manager determines

17  that the sales representative met the established criteria of the plan, the manager or his delegate

18  submits a gross dollar amount of incentive compensation to SCO by e-mail or web file.  SCO

19  loads the dollar amount into OMEGA and it is paid to the sales representative in the following

20  pay period.

21         16.    At least once each year, HP distributed Sales Letters and Credit and Compensation

22  Plans to sales employees who had an assigned quota.  The Sales Letters contained the quota,

23  customer/territory assignments, performance metrics, and performance period.

24         17.    The Sales Compensation Policy informed sales representatives that they were

25  responsible for reviewing the Sales Letter and for escalating any concerns about the Letter to their

26  managers within 30 days.  This language is reflected on the following pages of the Policy: FY06

27  North American Sales Compensation Incentive Pay Administration Policy, p.20, HP00007770;

28  FY07 HP Global Sales Compensation Policy, effective 11-1-06, p. 4, HP00000549; FY08 HP

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6

4

DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1  Global Sales Compensation Policy, effective 11-1-07, p.5, HP00000652; FY09 HP Global Sales

2  Compensation Policy, effective 11-1-08, p. 6, HP00000819.

3       18.    The Credit and Compensation Plan explained how incentive compensation would

4  be calculated under that particular plan. Those Plans have included language stating, "There are

5  no oral agreements concerning incentive compensation between the sales employee and Hewlett-

6  Packard which are not contained herein," and that modification is not effective unless approved in

7  writing by identified management. This language is reflected on the following pages of the Plans,

8  which applied to the named Plaintiffs (and are attached to the Declaration of Joanne Thiel): FY

9  2005 U.S. Sales Incentive Credit and Compensation Plan, effective 5-1-2005, HP00373777 (All

10  Plaintiffs); FY2005 U.S. Sales Incentive Credit and Compensation Plan, effective 11-01-2005, p.

11  2 , HP00373791 (Purvis, Simmons); FY2005 U.S. Sales Incentive Credit and Compensation Plan,

12  effective 5-1-2005, p. 2, HP00373795 (Riese); FY2006 U.S. Sales Incentive Credit and

13  Compensation Plan, effective 11-1-2005, p. 2, HP00002473 (Johnson, Riese); FY2006 U.S. Sales

14  Incentive Credit and Compensation Plan, effective 5-1-2006, p. 2, HP00002478 (Johnson, Riese);

15  FY2006 U.S. Sales Incentive Credit and Compensation Plan, effective 11-1-2005, p. 2,

16  HP00002486 (Simmons); FY2006 U.S. Sales Incentive Credit and Compensation Plan, effective

17  5-1-2006, p. 2, HP00002491 (Simmons); FY2006 U.S. Sales Incentive Credit and Compensation

18  Plan, effective 5-1-2006, p. 2, HP00215615 (Purvis); FY2007 U.S. Sales Incentive Credit and

19  Compensation Plan, effective 11-1-2006, p. 2, HP00002497 (Simmons); FY2007 U.S. Sales

20  Incentive Credit and Compensation Plan, effective 11-1-2006, p. 2, HP00002509 (Johnson);

21  FY2007 U.S. Sales Incentive Credit and Compensation Plan, effective 11-1-2006, p. 2,

22  HP00002513 (Riese); FY2007 U.S. Sales Incentive Credit and Compensation Plan, effective 11-

23  1-2006, p. 2, HP00002518 (Riese); FY2007 U.S. Sales Incentive Credit and Compensation Plan,

24  effective 11-1-2006, p. 2, HP00215622 (Purvis).

25       19.    HP reserves the right to amend any aspect of an employee's sales compensation,

26  including (but not limited to): mix of base and incentive pay, reassignment, addition or deletion of

27  designated accounts; and/or increase or decrease of corresponding quota and sales objectives.

28  This language is reflected in, for example, the Credit and Compensation Plan for Shaun Simmons

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6     5     DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1   in FY06, a true and correct copy of which is attached as Exhibit 11: FY06 U.S. Sales Incentive

2   Credit and Compensation Plan, SI/Alliance Manager, p. 2, HP00002486, (Shaun Simmons).    HP

3   also reserved its right to alter the Plans through Policy documents. *E.g.,*  FY06 FY North

4   American Sales Compensation Incentive Pay Administration Policy, effective 11-1-05, p. iv.,

5   HP000007761 ("Hewlett-Packard reserves the right to adjust the assigned Plans"); *accord* FY06

6   Global Sales Compensation Incentive Pay Administration Policy, effective 5-1-06, p. 4,

7   HP00000417; FY07 HP Global Sales Compensation Policy, effective 11-1-06, p.3, HP00000548;

8   FY08 HP Global Sales Compensation Policy, effective 11-1-07, p.4, HP00000651; FY09 HP

9   Global Sales Compensation Policy, effective 11-1-08, p. 5, HP00000818.

10          20.     Except where noted, the Sales Letter and Credit and Compensation Plan are

11   referred to collectively as the "Sales Compensation Plan."

12          21.     The Sales Compensation Plan governed a sales representatives' compensation for

13   the designated performance period—which typically was quarterly, semi-annual, or annual.  The

14   Sales Compensation Plans were assigned based on each sales representative's "Sales Specialty."

15   There were between 200 and nearly 500 different Sales Specialties in each year from FY06 to

16   FY09.   Specifically, in FY05, there were 485 Sales Specialties; in FY06, 402; in FY07, 398; in

17   FY08, 343; and in FY09, 226 Sales Specialties.  Each Sales Specialty has a unique code and that

18   Sales Specialty code is tied to a Sales Letter.

19          22.     Under the Sales Compensation Plans, "[s]ales credit drives sales employee

20   compensation."  The principal method for recognizing sales efforts was sales credit based on a

21   defined quota.  Sales credit was measured against a sales representative's quota during the

22   performance period. This language is reflected on the following pages of the Policy:  HP

23   Marketing Policy - Sales Credit, effective May 1, 2005, p.2, HP00000228; HP Marketing Policy -

24   Sales Credit, effective May 1, 2005, p.2, HP00000445; FY07 HP Global Sales Compensation

25   Policy, effective 11-1-06, p. 16, HP00000586; FY08 HP Global Sales Compensation Policy,

26   effective 11-1-07, p.16, HP00000663; FY09 HP Global Sales Compensation Policy, effective 11-

27   1-08, p. 17, HP00000830.  Attached hereto as Exhibit 12 is a true and correct copy of HP

28   Marketing Policy – Sales Credit, effective May 1, 2005, HP00000227 and attached as Exhibit 13

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                6                DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1   is a true and correct copy of HP Marketing Policy – Sales Credit, effective May 1, 2005,

2   HP00000443.

3        23.     Under their Sales Compensation Plans, some sales representatives could receive

4   sales credit for "direct sales" or "indirect sales."  "Direct sales" are those made directly by HP to

5   an end-user customer.  "Indirect sales" are sales of HP products made by HP "partners" (*i.e.,*

6   distributors) and "resellers" (*i.e.,* dealers, retailers, *etc.* that stock HP inventory)—both of which

7   often are referred to as "HP partners."  Some HP partners report their sales data to HP, which then

8   can be used in HP's sales crediting process, and some do not.

9        24.     Sales representatives may seek credit for indirect sales by partners who do not

10   report their sales data to HP.  To do so, a sales representative must submit a Manual Claim with

11   supporting documentation to request credit.  The Manual Claims process is described below.

12   **Calculation Of Incentive Pay**

13        25.     The amount of the incentive compensation paid to each sales representative who

14   carried a quota was based on the percentage of quota that each achieved.   On a quota carrying

15   plan, the incentive compensation may be determined by calculating the percentage of the quota

16   met by the sales credited to the sales representative and applying that percentage to the Target

17   Incentive Amount ("TIA").  The incentive compensation calculation will also consider other

18   factors, such as accelerators (multipliers) for performance attainment above 100%.  A sales

19   representatives' payment was determined by the TIA applicable to him or her, which was the

20   amount of incentive compensation that they would be paid if they achieved 100% of their quota

21   or objectives.

22        26.     Incentive pay "is calculated with a period-to-date calculation."  A sales

23   employee's performance attainment percentage was determined by dividing the cumulative

24   period-to-date sales credits by the employee's quota that applied to the entire performance period.

25   The resulting percentage was then multiplied by the TIA allocated to the performance for the

26   entire performance period.  The calculation may be complicated by slopes or accelerators.  Also

27   the metric incentive calculations may be independent of each other in some cases and weighted in

28   other cases.  This language is reflected on the following pages of the Policy:  FY06 FY North

1   American Sales Compensation Incentive Pay Administration Policy, effective 11-1-05, p. 12.,

2   HP00007772; FY06 Global Sales Compensation Incentive Pay Administration Policy, effective

3   5-1-06, p. 8, HP00000421; FY07 HP Global Sales Compensation Policy, effective 11-1-06, p.5,

4   HP00000550; FY08 HP Global Sales Compensation Policy, effective 11-1-07, p.7, HP00000654;

5   FY09 HP Global Sales Compensation Policy, effective 11-1-08, p. 8, HP00000821.

6                               **Sales Crediting & Payment**

7           27.     The Sales Compensation Policy and Credit Policy contained a number of

8   provisions about how and when the sales transactions would be credited and paid to sales

9   representatives.  The policies stated that HP would credit the sales as soon as possible after the

10  shipment/order and would pay the incentive compensation in the pay cycle following crediting.

11  The following are pages from the Policy that reflect this: FY06 North America Sales

12  Compensation Incentive Pay Administration Policy, 11-1-05, p. 11, HP00000338 (payment of

13  incentive components "generally occur monthly, quarterly, semi-annually, or annually" and

14  frequency is contained "in the Sales Plan for each incentive employee"); FY06 Global Sales

15  Compensation Incentive Pay Administration Policy, p. 25, HP00000438 ("HP will provide

16  incentive payments to sales employees as soon as possible after crediting occurs within the

17  compensation system. Incentive payments occur in the month following crediting."); FY06 North

18  America Sales Credit Implementation Guidelines, 5-1-2006, p. 4, HP00000397 ("[w]hile most

19  credit is posted between one and six weeks after shipment or order/certification date, the

20  application of sales credit may be deferred beyond this timeframe, until all require data is

21  captured"); *id.* at 5, HP00000398 ("Partner reported transactions typically appear within 30-45

22  days for named account assignments.  It can take 60 or more days for the transaction to appear if

23  the end-user customer is not identifiable in normal processing."); HP Global Sales Compensation

24  Policy, 11-1-2006, p. 13, HP00000558 ("Incentive pay is based on monthly pay cycles," is

25  "provided to sales employee[s] as soon as possible after crediting occurs within the compensation

26  system," and "occur in the month following sales crediting"); FY07 AMS Sales Compensation

27  Operations U.S. & Canada Sales Compensation Handbook, 11-1-06, p. 3, HP00000885; FY08

28  AMS Sales Compensation Operations U.S. & Canada Sales Compensation Handbook, 11-1-07, p.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                8        DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1   3, HP00000900; FY08 Global Sales Compensation Policy, p. 14-15, HP00000661-662.

2          28.     The Sales Credit Policy made clear that the timing of when credit was viewable

3   and applied to sales representatives was dependent on the Sales Compensation Organization

4   ("SCO") receiving sales data from HP's own order management systems and from reports by

5   HP's partners of their sales data to HP.  The Sales Credit Policy stated that application of credit

6   would not occur until "all required data is captured." This language is reflected on the following

7   pages of the Policy: FY06 North American Sales Credit Implementation Guide, p 4,

8   HP00000311; FY07Americas Sales Compensation Operations U.S. & Canada Sales

9   Compensation Implementation Guidelines, effective 11-1-06, p. 3, HP00000885; FY08Americas

10  Sales Compensation Operations U.S. & Canada Sales Compensation Handbook, effective 11-1-

11  07, p.3,  HP00000900; FY09 Americas Sales Compensation Operations U.S. & Canada Sales

12  Compensation Handbook, effective 11-1-08, p.3, HP00000911.

13         29.     The Sales Credit Policy also defined the date that credit would be recognized for

14  direct sales of products, direct sales of services, and indirect sales by reporting partners.  This is

15  reflected in the following pages of the Policy: FY06 HP Marketing Policy – Sales Credit,

16  effective 5-1-06, HP00007975; FY06 North American Sales Credit Implementation Guide, pp.

17  10- 13, HP00000317-320; FY07 Americas Sales Compensation Operations U.S. & Canada Sales

18  Compensation Implementation Guidelines, effective 11-1-06, pp. 9-14, HP00000891-896; FY08

19  Americas Sales Compensation Operations U.S. & Canada Sales Compensation Handbook,

20  effective 11-1-07, pp 4-7, HP00000901-904;  FY09 Americas Sales Compensation Operations

21  U.S. & Canada Sales Compensation Handbook, effective 11-1-08, pp. 4-7, HP00000912-915.

22  Attached hereto as Exhibit 14 is a true and correct copy of FY06 HP Marketing Policy – Sales

23  Credit, effective 5-1-06, HP00007975.

24         30.     The date of a credit depended on whether the sale was a product or service and

25  whether it was direct or indirect.  But, in all events, crediting did not occur until all crediting data

26  reached OMEGA.  No policy documents or official communication of HP has ever committed to

27  a 30-day deadline.   Once crediting occurred, pursuant to Policy, HP then paid incentives in the

28  following pay cycle.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

9

DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

31.     The Sales Compensation Policy describes when an "incentive liability" may occur. Incentive liability would occur, for example, when an order or shipment is cancelled or returned to HP or a partner.  In such instances of "negative transactions," the incentive payment is only an advance and is recoverable by HP.  This is reflected in the following pages of the Policy: FY06 North American Sales Compensation Incentive Pay Administration Policy, effective 11-1-05, p. 27., HP00007787; FY07 HP Global Sales Compensation Policy, effective 11-1-06, pp. 7-8, HP00000552-553; FY08 HP Global Sales Compensation Policy, Effective 11-1-2007, HP00000656; FY09 HP Global Sales Compensation Policy, effective 11-1-08, p. 10, HP00000823.

32.     In Fiscal Year 2007, HP implemented a 60% Performance Threshold, which was included in the Sales Compensation Plans. Under this Threshold, all incentive compensation paid throughout the performance period was conditional on the sales representative achieving at least 60% performance attainment and, if they failed to do so, all incentives were recoverable—*i.e.*, had to be re-paid.   Policies and communications reflecting this include the following: FY08 Sales Compensation Plan Communication Session PSG SPO, HP00219231, p. 11-12, 16, 22, (performance threshold is the threshold that must be met prior to earning the incentive pay that was issued as a pay advance), attached as Exhibit 15; FY07 HP Global Sales Compensation Policy, 11-1-2006, at p. 7, HP000000552 ("Performance level pay advances, when applicable, are described in the Sales Letter[.]"); FY08 HP Global Sales Compensation Policy, 11-1-2007, at p. 9, HP00000656 (same); FY09 HP Global Sales Compensation Policy, 11-1-2008, at p. 10, HP00000823 (same).  Incentives paid monthly were only conditional pay advances that were not deemed earned until the end of the performance period when HP could determine if the sales employee achieved the 60% threshold.  The 60% Threshold applied to all of the named Plaintiffs beginning in FY07 until the end of their employment with HP.

33.     To track sales credit and spot any issues, sales representatives were given access to OMEGAOnline, which is an Intranet tool where information is posted about sales credits to date and performance attainment.

34.     Under the Sales Compensation Policy, it was "the responsibility of the sales

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6

10

DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1   employee to review sales crediting on a monthly basis and report errors to the appropriate Sales

2   Compensation Operations team and sales manager."   This language is reflected in the following

3   pages of the Policy: FY06 North American Sales Compensation Incentive Pay Administration

4   Policy, effective 11-1-05, p. 27, HP00007787; FY07 HP Global Sales Compensation Policy,

5   effective 11-1-06, p. 7, HP00000552; FY08 HP Global Sales Compensation Policy, Effective 11-

6   1-2007, HP00000656; FY09 HP Global Sales Compensation Policy, effective 11-1-08, p. 10,

7   HP00000823.

8       35.   Sales representatives are able to search OMEGAOnline by customer, channel, and

9   order, among others.  Sales representatives receive monthly Incentive Earnings Statements (called

10   Global Incentive Statements or "GIS" statements) generated from OMEGA which show the total

11   amount for which they received credit for each metric under their sales specialty for each plan

12   period as well as their incentive compensation for each sales specialty as well as any bonuses,

13   both new in the month and period to date.  The sales representatives are able to view the GIS

14   Statements via the Intranet.  Once the sales representatives receive their paychecks, they can

15   determine if the amount of incentive compensation paid to them matches the amount that they

16   were supposed to receive in accordance with their individual GIS statements.  Attached as Exhibit

17   16 is a true and correct copy of the OMEGAOnline Start Up Guide, HP00314657, available to

18   sales representatives.  Attached hereto as Exhibit 17 is a true and correct copy of instructions

19   provided to sales representatives on how to access OMEGAOnline, HP00314653.

20                               **Fiscal Year Start-Up**

21       36.   HP's business runs on a Fiscal Year beginning November 1st and ending October

22   31st.  At the beginning of each Fiscal Year, sales representatives typically were paid a pay

23   advance in the form of a draw.  The draw period was an integral part of HP's incentive

24   compensation process, because it takes time to finalize the terms of new Sales Letters (which

25   change each year) and to set up, load, and test the compensation system to ensure that, for

26   example, quotas and metrics are input accurately.  Once the sales compensation system "opened,"

27   actual incentives were calculated for the draw period and, if the draw was less than the incentives

28   paid, an additional payment was made to the sales representative. HP's Sales Compensation

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                11

DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

1    Policy expressly reserves the right implement a draw period "at HP's discretion."  This is

2    reflected in the following pages of the Policy: FY08 Global Sales Compensation Policy, 11-1-

3    2007, HP00000655; *see also* FY05 U.S. Sales Compensation Incentive Pay Policy, 11-1-04,

4    HP00010487 (draw methodology may be used when "system issues prevent normal incentives

5    from being calculated"); FY06 North America Sales Compensation Incentive Pay Administration

6    Policy, 11-1-05, HP00000328 (same); FY07 HP Global Sales Compensation Policy, 11-1-06,

7    HP00000551 (draw methodology may be used "at HP's discretion").  Attached hereto as Exhibit

8    18 is a true and correct copy of FY05 U.S. Sales Compensation Incentive Pay Policy, 11-1-04,

9    HP00010487.

10                                    **Manual Claims Process**

11          37.     A "Manual Claim" is the procedure used for sales representatives to (1) seek credit

12   for a sale made to an end-user by a non-reporting partner and (2) identify any instance where they

13   believe they were not properly credited for a sale under the terms of their Sales Compensation

14   Plan.  The Manual Claim procedure is described in various policy documents. True and correct

15   copies of relevant policy documents, including the following: FY06 North American Sales Credit

16   Implementation Guide, pp. 6-9, HP00000313-316; FY07 Americas Sales Compensation

17   Operations U.S. & Canada Sales Compensation Implementation Guidelines, effective 11-1-06,

18   pp. 3-8, HP00000885-890; FY08 Americas Sales Compensation Operations U.S. & Canada Sales

19   Compensation Handbook, effective 11-1-07, p 3, HP00000900;  FY09 Americas Sales

20   Compensation Operations U.S. & Canada Sales Compensation Handbook, effective 11-1-08, p. 4,

21   HP00000912; FY06 Manual Claims Checklist, HP00000872.  True and correct copies of the

22   following also are attached; FY07 Manual Claims Checklist, HP00000872 (attached as Exhibit

23   19); FY08 Manual Claim Matrix, HP00000873 (attached as Exhibit 20); Sales Manual Claims

24   Website (SMCW) Roll-Out PowerPoint, HP00014868 (attached as Exhibit 21); Sales

25   Compensation PowerPoint, HP00218075 (attached as Exhibit 22).

26          38.     Claims are submitted via an Intranet website to the Sales Compensation

27   Organization (SCO) beginning in FY08.  In prior years, claims were submitted by email.  Criteria

28   that the sales representative must meet for approval of a manual claim are set out in the Sales

1    Credit Policy, including the requirement that all claims must be submitted by a published deadline

2    and must meet established monetary thresholds.  The minimum threshold requirement prevents

3    Manual Claims for sales that will yield too small of an incentive payment to justify the time and

4    effort involved in filing and processing the Manual Claim.

5          39.    Sales representatives would not get credit for un-reported sales by non-reporting

6    resellers in their territory unless they filed a valid Manual Claim with supporting documentation

7    and the Claim is approved.  If a non-reporting resellers' un-reported sales data is not brought to

8    SCO's attention by a valid Manual Claim, no sales representative is entitled to credit for the sale

9    under the Sales Compensation Plans.

10          40.    Manual claims are subject to manager approval.  Once the manager approves the

11   claim, the claims are processed by SCO.  SCO reviews and approves the claim if it is: (1) timely,

12   (2) above the threshold, (3) properly creditable to the sales representative under the sales

13   representative's sales plan, and (4) not already paid.  Once the claim is approved, the sales

14   representative is credited for the sale that is the subject of the manual claim.  A large percentage

15   of all manual claims are rejected because SCO determines that the sales representative was

16   already paid on the manual claim.

17          41.    SCO employs Sales Compensation Support Specialists (also referred to as "Sales

18   Measurement Specialist" or "SMS") that it assigns to specific sales groups to assist the sales

19   representatives with incentive compensation issues.  The SMSs are available to assist with the

20   Manual Claims process.  Sales representatives are advised to contact their SMSs with any issues

21   regarding sales crediting, and are instructed to report any problem with the accuracy of their

22   incentive compensation pay to their assigned SMS, who is responsible for remedying any

23   problems raised by their assigned sales representatives.

24          42.    If, after reviewing OMEGAOnline, a sales representative believes that he or he has

25   not been properly credited for a sale, the sales representative can raise the issue with his or his

26   manager or SMS, or the sales representative can file a Manual Claim.  If a sales representative

27   files a Manual Claim, the SMS or claims specialist will notify the sales representative about the

28   status of their Manual Claim by email.  If the claim is approved, the sales representative can view

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                        13                      DECL. OF ROBERT SLABY IN SUPPORT OF
                                                             DEFENDANT'S MOTION FOR SUMMARY
                                                             JUDGMENT (CASE NO. C-09-03596 CRB)

1   the resulting credit in OMEGAonline.  The Sales Compensation Policy informed sales

2   representatives of their obligation to review their sales credit monthly and to report any issues.

3   **OMEGA's Role And Function In The Sales Compensation Architecture.**

4   43.   OMEGA is HP's incentive compensation credit and payment engine.  OMEGA's

5   role in HP's sales compensation system is as follows. The sales compensation architecture must

6   support HP's business structure and content of individual sales plans.  For example, in FY09,

7   HP's United States operations had three Business Groups, 12 Regional Business Units; 91 Sales

8   Groups; 5,042 sales representatives; and 226 Sales Specialties. Sources of sales data and the route

9   taken to OMEGA vary by Sales Specialty.

10   44.   Sales data is fed into HP's sales compensation process from a variety of different

11   manual and electronic systems. Sales data filters through a Data Warehouse called the Sales

12   Incentive Quota Performance (SIQP) system, which is a database that houses pre-credited sales

13   transactions.  Sales data fed into SIQP are "enriched," meaning additional information (*e.g.*,

14   territory, product, zip code of purchaser, correct names, *etc.*) is attached so that the transaction

15   can be credited to a specific sales representative.  Once enriched in SIQP, the sales data is

16   transmitted to the OMEGA System, the crediting and payment engine that calculates the incentive

17   compensation to be paid to each sales representative.  OMEGA matches the sales data from SIQP

18   to the individual sales representative who is entitled to be credited for that sale according to the

19   terms of that sales representative's Sales Letter, calculates the performance attainment

20   percentage, applies that percentage to the Target Incentive Amount to determine payment, nets

21   the payment against prior payments and/or any liabilities, and sends the resulting sum to payroll

22   for payment to the employee.  Other sales bypass SIQP, and the data relating to those sales is

23   enriched through manual processes and/or other systems.  For example, for some sales

24   representatives, data on orders to be credited were input manually into OMEGA. For other sales

25   representatives, data on orders are systemically fed into SIQP and then into OMEGA.

26   **OMEGA Supports HP's Business Requirements.**

27   45.   Since 2005, HP has reviewed other systems as possible replacements for OMEGA

28   to upgrade to "state-of-the art" software and improve user interface, including systems from

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                14                DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

Callidus Software, Oracle, Siebel, and SAP.  For example, from 2005 to 2007, HP conducted a $25 million experiment with a system called Callidus TrueComp.   HP ultimately rejected Callidus TrueComp because it was unable to process the volume of sales data required to support HP's sales compensation process—which involved about 140 million transactions and 875 million credits 2007.  Since then, HP has continually surveyed the vendor market for new options. HP's reasons for reviewing other systems do not include finding a *faster* system to process sales data because OMEGA is faster than any system HP has tested or believes to be on the market. HP uses OMEGA because it continues to be the best fit to support HP's business judgments about how to most effectively motivate and pay its diverse sales force.  HP has continually surveyed the market place but has chosen OMEGA as its best choice for processing an enormous volume of sales data and crediting diverse set of sales plans that support HP's business goals.

### Processes To Ensure Accuracy Of OMEGA Data

46.     At the beginning of each fiscal year, HP sets up and tests OMEGA to make sure that it is functioning properly and correctly calculating the incentive compensation for the sales representatives.  During this "readiness" period, SCO loads and validates each sales representative's personal information, reporting structure, job code, organization code, and other information.  SCO inputs, updates, and checks the billing and crediting of all of its direct business and partner business, including checking the crediting rules and points of contact associated with each source of sales data.

47.     One week each month, SCO performs numerous tasks generally referred to as "pay week activities" to review the current month's sales incentive payments and make adjustments as needed.  These activities include verifying the correct status (active, terminated, leave of absence) of its sales representatives; checking that bonuses were submitted for payment via web feed; confirming that manual attainment was submitted via web feed; verifying that quota was submitted for new hires; generating the "10K report" (which is a report used to review payments to sales representatives) to forward to the sales managers to confirm that payments were accurate; submitting pay adjustments as necessary; submitting plan variable adjustments to correct any errors; reviewing rejected manual web feeds; verifying current attainment by looking for no pay,

1   significant change in performance, or high pay anomalies, including reviewing prior month

2   statements which could explain a change in performance; and verifying that prior months'

3   credited sales are correctly impacting current month pay.

4       48.     After the final payment adjustments have been approved and entered, a Final

5   Statement Control Reconciliation is performed.  The SCO Payment Administrator runs reports

6   from the SIGMA web application for Seated, Liability, and Payment Detail Pending and

7   compares the results with the GIS Statements to validate that the incentive compensation and

8   payroll results from these reports are consistent.

9       49.     On a monthly basis, SMSs in SCO review the information in the "Roster Tool" to

10  ensure that the seating, affiliation and assignment rules were accurately entered into OMEGA,

11  and reconcile that information to ensure that OMEGA pays sales representatives according to the

12  rules of their individual sales plan.  Periodically throughout the year, SCO performs a thorough

13  review of its sales compensation practices.

14      50.     Despite HP's efforts to keep the system running smoothly, issues arose when, for

15  example, HP consolidated its data warehouses in 2008 and, in 2009, there were start-up issues at

16  the beginning of the Fiscal Year that delayed quota deployment in TSG.  But each time issues

17  arose, IT and SCO addressed them promptly.

18                    **The WallStreet Journal Article Of August 2009**

19      51.     In August 2009, the Wall Street Journal published an article about delays in

20  payment of incentive compensation to certain sales representatives at HP in 2009.  The issues

21  discussed in the Wall Street Journal article resulted from certain sales representatives being paid a

22  draw, rather than actual incentive compensation, for longer than usual. This was due to a number

23  of factors, including a decision to change quotas at the beginning of the fiscal year due to the

24  deteriorating economy, the reorganization of an HP business, and issues with the implementation

25  of QuEST, a new program that generated quota and sales letters for HP's sales representatives.

26  These issues did not involve any issues with OMEGA.  These issues would not have affected

27  affect Jeffrey Johnson, James Purvis, Jennifer Riese, or Shaun Simmons, who had resigned.

28      52.     The issue with QuEST related to quota deployment in TSG.  SCO manually loads

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                    16          DECL. OF ROBERT SLABY IN SUPPORT OF
                                              DEFENDANT'S MOTION FOR SUMMARY
                                              JUDGMENT (CASE NO. C-09-03596 CRB)

the quota and assignments for all of the sales plans applicable to its sales representatives into OMEGA.  Until Fiscal Year 2008, SCO utilized a tool called FRANQ to transmit the Sales Letters to the sales representatives.  Sales representatives were asked to affirmatively accept the terms of the sales plan communicated in the Sales Letter and related Credit and Compensation Plan.  For a period in Fiscal Year 2008, SCO manually transmitted the Sales Letters to the sales force.  Then, in Fiscal Year 2009, SCO moved to a system called QuEST, which captures, contains, and communicates quota and assignments to the sales representatives.  QuEST also calculates quota for the sales representatives.  The transition from FRANQ to QuEST caused some delays in issuing Sales Letters in FY09, particularly in TSG.

**Simmons Reconciliation**

53.     After the lawsuit was filed, HP conducted a reconciliation analysis of the pay of each named Plaintiff.  During the pay reconciliation analysis of Simmons, there originally appeared to be no issues with his sales credit and payments.  A review of manual transactions was conducted and one manual transaction for FY08 for Simmons appeared to be under-credited.  Consequently, the original transaction files were collected and I conducted interviews to validate the transaction status.  We ultimately confirmed that the 2008 transaction was marked "indirect" instead of "direct" as a result of a keystroke error, which reduced the credit value of the transaction from $10,438,808.00 to $6,226,315.65.  This resulted into an underpayment to Simmons in the amount of $272.99.  SCO initiated a check request and the check was mailed to Simmons on January 13, 2011.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6

17

DECL. OF ROBERT SLABY IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (CASE NO. C-09-03596 CRB)

**Oracle Document**

54.   Attached as Exhibit 23 is a true and correct copy of a document used by Plaintiffs' counsel in a deposition that appears to be created by an Oracle employee (Jeff Brugos) that purports to quote an HP executive as saying, "it is taking over 8 months to pay some sales people."

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 4th day of February 2011 in Palo Alto, California.

ROBERT SLABY

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
PALO ALTO

DB2/22178764.6                         18                  DECL. OF ROBERT SLABY IN SUPPORT OF
                                                          DEFENDANT'S MOTION FOR SUMMARY
                                                          JUDGMENT (CASE NO. C-09-03596 CRB)