**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JEFFREY JOHNSON, et al.,                    No. C 09-03596 CRB

12              Plaintiffs,                      **MEMORANDUM AND ORDER
                                                 DENYING MOTION TO AMEND AND
13      v.                                       GRANTING MOTIONS FOR
                                                 SUMMARY JUDGMENT**
14   HEWLETT-PACKARD COMPANY,

15              Defendant.
     _____/

16

17        This is an employment compensation putative class action "aris[ing, in Plaintiffs'

18   view] out of [Hewlett-Packard's ("HP")] acknowledged failures over the past several years to

19   record timely and accurately the sales of its equipment and services; and to calculate

20   properly, and pay timely, the commissions and bonuses . . . owed to HP's sales

21   representatives . . . ."  Third Am. Compl. (dkt. 69) ¶ 1.

22        Several Motions are presently before the Court.  First, Plaintiffs move for leave to file

23   a Fourth Amended Complaint to "clarify" the nature of their attack on HP's incentive pay

24   system.  Mot. to Am. Compl. (dkt. 180).  Second, HP moves for summary judgment as to

25   each named Plaintiff's claims and has filed comprehensive Objections to Plaintiffs' evidence.

26   Dkts. 140 (Summ. J. re Reise), 147 (Summ. J. re Johnson), 148 (Summ. J. re Purvis), 153

27   (Summ. J. re Simmons), 218 (Objections to Evidence).  Third, each party has filed an

28   Objection regarding discovery orders.   Dkts. 221 & 225.

HP might have underpaid, and/or paid late, some of its sales representatives. However, Plaintiffs lack sufficient evidence to create a triable issue as to whether they were underpaid or paid late. Further, it is too late for Plaintiffs to amend their Complaint, for a fourth time, to "clarify" the nature of their challenge to HP's incentive pay compensation system. Therefore, (1) Plaintiffs' Motion to Amend is DENIED; (2) HP's Motions for Summary Judgment are GRANTED; and (3) the discovery rulings leading up the filing of these Motions are affirmed.

## I.      MOTION FOR LEAVE TO AMEND

### A.      Background

The currently operative Complaint (the Third Amended Complaint), filed July 21, 2010, contains the following allegation: "HP has protested that its failures [to properly pay wages] are due to flaws with the computer software system – known as Omega – that records sales and calculate[s] commissions." Third Am. Compl. (dkt. 69) ¶ 2. "Omega" refers both to a computer program/system by that name and, at least to HP's sales representatives, also to HP's entire incentive compensation system. Plaintiffs assert that, when they drafted the original Complaint and subsequent amended Complaints, they intended "Omega" to have the broad definition (HP's entire incentive pay system) and did not realize that it also had a narrow "technical" meaning within HP. Id. Further, Plaintiffs claim that they "reasonably understood that Omega was synonymous with HP's entire sales commissions compensation system, and they had no basis for amending their Complaint to expressly define the term" prior to HP's Motions for Summary Judgment. Mot. to Am. Compl. (dkt. 180) at 12.

In light of those Motions, however, Plaintiffs now assert that HP (and, as will be discussed in more detail below, the Special Discovery Master and Magistrate Judge Zimmerman) were improperly using the narrow, technical definition of "Omega" (i.e., that it is a computer program) to artificially restrict discovery and constrict their case on summary judgment. To correct the misunderstanding as to the meaning of "Omega" and to make their attack on HP's incentive pay system clear, Plaintiffs propose to add the following "definition" of Omega to the Complaint:

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1
2
3
4
5

"Omega" and "Omega system(s)" mean the entire commission/incentive pay compensation system, process, or processing system used, refined, or developed by HP since at least 2004 to calculate, compute or otherwise ascertain commissions/incentive pay for HP sales representatives.  The terms "Omega" and "Omega system(s)" include but are not limited to, all engines, tools, databases, data feeds, data warehouses, indirect seller sources, programs, servers, software, hardware, or systems that feed into, stand behind, or relate to that commission/incentive pay compensation system.

6

Id. at 1.

7

8      Whatever understanding Plaintiffs might have had as to the meaning of "Omega" at

9  the outset of this case,[1] three rulings from this Court, Magistrate Judge Zimmerman, and

10  special discovery master Judge Warren, certainly in combination, clearly put them on notice

11  that their purported understanding of "Omega" was not the only one and certainly was not

12  the one being used by HP or the Court.

13      First, in July 2010, in an Order denying HP's Motion to Dismiss Plaintiffs' contract

14  claims, this Court noted that (1) "Plaintiffs claim they earned commissions that, because of a

15  computer glitch, were never paid, or at the very least were paid late" and (2) the common

16  breach suffered by putative class members was that "[HP] failed to pay the commissions to

17  which Plaintiffs were entitled because of a computer error."  July 6, 2010 Order (dkt. 62) at

18  5-6 (emphasis added).

19      Second, on September 27, 2010, Magistrate Judge Zimmerman denied Plaintiffs'

20  discovery requests other than those concerning "malfunctions of OMEGA."  Sept. 27, 2010

21  Order (dkt. 86) ¶ 4 ("The Court construes requests for production numbers 4 and 5 as

22  inquiring about disputes which involve a malfunction of OMEGA."), ¶ 5 ("Plaintiffs fail to

23  limit [] request [number 7] to documents relating to malfunctions with OMEGA."), ¶ 7

24
25
26
27
28

---

[1] Plaintiffs' assertion that they believed at the outset of this lawsuit that "Omega" referred only to HP's entire incentive pay compensation system is belied by a January 22, 2010 Joint Case Management Statement.  Dkt. 23.  In that Statement, Plaintiffs described their case "as a class action on behalf of current and former HP employees who sold HP's services and equipment, but were not paid their earned commission and bonuses because of a system-wide computer glitch in a system known as "Omega."  Id. at 2 (emphasis added).  The assertion that HP failed to pay earned commissions because of a "computer glitch" in "Omega" is inconsistent with Plaintiffs' current position that they always understood "Omega" to refer to HP's entire incentive pay system and not also to a computer program within that system known as "Omega."

3

1  ("Plaintiffs fail to limit [requests 14 and 16] to documents stemming from alleged problems

2  caused by OMEGA.").

3      Finally, and perhaps most significantly, on January 27, 2011, Judge Warren, acting as

4  Special Discovery Master, issued a written Order on the meaning of "Omega" following an

5  extensive review of the allegations in the Third Amended Complaint.

> Plaintiffs have alleged that "Omega" refers to a computer
> program bearing that name, and that HP's compensation system
> is derivatively known as "Omega." <u>The Referee thus rules that
> Plaintiffs' use of "Omega" is to a computer program or a system
> of that name, and not an "ecosystem" of which Omega is merely
> a part.</u>

Order Re Initial Discovery Disputes (dkt. 137) at 5 (emphasis added).[2]

* * *

Almost two months after Judge Warren's ruling, on March 24, 2011, Plaintiffs filed a

Motion for Leave to Amend to "clarify" what they mean by "Omega" and the scope of their

attack on HP's incentive pay compensation system.

**B.    Legal Standard**

After a party has amended as a matter of course, further amendment is allowed only

with consent of the opposing party or leave of the court.  Fed. R. Civ. P. 15(a).  Leave of

court "shall be freely given when justice so requires."  Id.

Courts are to consider five factors in deciding whether to grant leave to amend.  See

Foman v. Davis, 371 U.S. 178, 182 (1962).  Those factors are (1) undue delay in seeking

amendment; (2) repeated failure to cure deficiencies by prior amendment; (3) undue

prejudice to the opposing party; (4) bad faith or dilatory motive; and (5) futility of

amendment.  Id.

//

_____

[2] On April 21, 2011, Judge Warren issued a follow-up Order on the issue of the meaning of "Omega."  Among other things, he noted that (1) "[f]rom the beginning of the Master's involvement in this case, what is and what isn't 'Omega' has been disputed by the parties.  The Master resolved that issue finally [on] January 27, 2011, from which Plaintiffs did not appeal"; and (2) "Plaintiffs have offered no reason for their decision to wait two months after they learned that their definition of Omega was more restricted than they wished it to be before filing their Motion to Amend."  Apr. 21, 2011 Order (dtk. 193) at 2-3.

4

C.      Discussion

        1.      **Plaintiffs Have Unduly Delayed Seeking Amendment**

A party unduly delays seeking amendment by failing to seek amendment reasonably promptly after it "knew or should have known" that amendment was called for.  See AmisourceBergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 953 (9th Cir. 2006).

Plaintiffs assert that it was not until HP argued for a narrow construction of the meaning of "Omega" in HP's Motions for Summary Judgment that "[Plaintiffs] conclude[d] that the Complaint should be amended to clarify any confusion about the meaning of 'Omega.'").  Mot. to Am. Compl. (dkt. 180) at 12.  This ignores not only the allegations in the Third Amended Complaint describing Omega as a software program[3] but also (1) Plaintiffs' description of their case in the Joint Case Management Statement and Oppositions to HP's Motions to Dismiss and (2) the discovery Orders discussed above.

For example, Judge Warren noted that the meaning of "Omega" in the Third Amended Complaint was disputed at least from the time he entered the case in mid-December 2010. Apr. 21, 2011 Order (dkt. 193) at 2-3.  Even before that, in January and February 2010, Plaintiffs summarized their allegations to this Court as involving computer malfunctions and glitches.  Joint Case Management Statement (dkt. 23) at 2 ("Plaintiffs filed this case as a class action on behalf of current and former HP employees who sold HP's services and equipment, but were not paid their earned commission and bonuses because of a system-wide computer glitch in a system known as "Omega.") (emphasis added); Opp'n to Mot. to Dismiss (dkt. 40) at 3 ("HP uses a computer system, known as Omega, to track the sales

---

[3] For example, Plaintiffs:

- allege that HP's failure to pay wages is "due to flaws with the computer system – known as Omega – that records sales and calculate[s] commissions."  Third Am. Compl. (dkt. 69) ¶ 2.
- seek an injunction barring "use of the malfunctioning Omega system . . ."  Id. ¶ 3.
- wish to represent a class "whose sales, commissions and/or earnings were tracked by the Omega computer system used by HP . . . ."  Id. ¶ 55, 56.
- assert that class treatment is appropriate because (1) "use of the Omega computer system (and its accompanying data feeds/software[)]" is common to all putative class members, and (2) "[t]he malfunctions of the Omega computer system (and its accompanying data feeds/software . . ." caused them harm.  Id. ¶ 58.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  made by its representatives.  Omega does not function properly, and has not recorded a large

2  number of sales made by HP's sales representatives.  <u>Because of Omega's malfunctions,</u>

3  <u>HP's sales representatives have not been paid all of the commissions and bonuses owed to</u>

4  <u>them.</u>") (emphasis added).  The Court relied on Plaintiffs' narrow expression of the common

5  issue in this case, at least in part, in denying HP's motion to dismiss and/or strike class

6  allegations.  See July 6, 2010 Order (dkt. 60) (describing the Complaint as alleging a

7  "computer glitch").  Further, in September 2010, Magistrate Judge Zimmerman denied

8  Plaintiffs' discovery requests that went beyond documents related to OMEGA malfunctions.

9  Sept. 27, 2010 Order (dkt. 86).

10       The combination of (1) the Third Amended Complaint's allegations regarding Omega,

11  (2) Plaintiffs' representations as to what their case was about, (3) this Court's Order

12  characterizing the Third Amendment Complaint's allegations, and (4) the discovery rulings

13  should have put Plaintiffs on notice, at least as of September 2010, of the need to amend to

14  "clarify" their intended meaning of "Omega."[4]  At the absolute latest, Plaintiffs knew or

15  should have known of the need for amendment when Judge Warren issued his January 27,

16  2011 Order construing Omega to mean "a computer program or system of that name[.]"  Jan.

17  27, 2011 Order (dkt. 137) at 5.  Plaintiffs waited an additional two months after Judge

18  Warren's January 27, 2011 Order before seeking leave.

19                             * * *

20       In sum, Plaintiffs unduly delayed seeking amendment on a critical issue in this case –

21  assuming *arguendo* that HP had problems with its incentive pay system, were those problems

22  caused by a "computer glitch" or instead by widely divergent issues related to how

23  information was provided to the incentive payment system in the first place.  Plaintiffs might

24  have taken an expansive view of the meaning of Omega and the cause of HP's alleged

25  underpayment of incentive pay when they filed suit.  But that is not how they framed their

26

27      [4] In October 2010 Plaintiffs deposed Todd Hatfield, head of Sales Compensation for HP's

28  Graphics Business.  He told them that "people use 'Omega' as a term when they're talking about the actual piece of software or people also use 'Omega' in reference to the whole [compensation] process." Hatfield Depo. Tr. (dkt. 181-2) at 41:10-13.

case to the Court, and long before Plaintiffs sought amendment they should have been disabused of any belief that their broad view as to the meaning of Omega and the scope of this case was shared by HP or the Court.

### 2.    Failure To Cure Deficiencies By Prior Amendment

Plaintiffs are seeking to file a Fourth Amended Complaint. No prior amendments have addressed this issue.

### 3.    HP Will Be Unduly Prejudiced If Leave To Amend Is Granted

Plaintiffs frame their sought after amendment as a mere "clarification" of the parties' existing understanding as to the scope of Plaintiffs' claims. Mot. to Am. Compl. (dkt. 180) at 5-7. In fact, the sought after amendment is not nearly so minor.

Instead, allowing Plaintiffs to amend to "clarify" that they are challenging HP's entire incentive pay system would require dramatically expanding discovery on the eve of summary judgment. HP prepared its summary judgment Motions following extensive discovery on what HP (and the Court) believed was Plaintiffs' theory of the case – that a computer malfunction caused HP to underpay its sales staff. Indeed, HP has answered 112 requests for production, and Plaintiffs have exhausted their limits on depositions and interrogatories. Allowing amendment would require postponement of the summary judgment process and result in Plaintiffs taking new discovery to attempt to show that HP did not provide Omega with the proper information in the first place. That evidence – the "raw data" (e.g., invoices, sales records, shipping records, and warranty information) behind HP's incentive pay process – is very different from the evidence Plaintiffs obtained regarding alleged Omega malfunctions.[5] Indeed, Plaintiffs essentially want to press a discovery reset button now that the "computer glitch" theory has not borne fruit.

This late-inning knuckleball would create the sort of moving target courts find to be unduly prejudicial. See Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798-99 (9th Cir. 1991)

---

[5] The Special Master has recently ordered HP to produce raw data from which Plaintiffs could attempt to reconstruct what they were owed and thereby show that they were actually paid less by Omega than they were entitled to under their contracts. Discovery Management Order ("DMO") 10 (dtk. 210) at 1-2. The Court discusses DMO 10 in more detail below.

United States District Court
For the Northern District of California

1  (affirming denial of motion to amend complaint notwithstanding plaintiff's characterization

2  of amendments as "implicit" in early pleadings because, among other things, amendments

3  were sought long after lawsuit was filed and after discovery was over); Gaston v. Exelon

4  Corp., 247 F.R.D. 75, 84 (E.D. Pa. 2007) (denying leave to amend because, in part,

5  "clarification" complicated the question of class certification); see also Roberts v. Az. Bd. of

6  Regents, 661 F.2d 796, 798 (9th Cir. 1981) (affirming district court's order denying motion

7  for leave to amend when party wanted to add new claim "at the eleventh hour, after

8  discovery was virtually complete, and [a] motion for summary judgment was pending before

9  the court.").[6]

10         Under these circumstances, HP will be unduly prejudiced if amendment is granted.[7]

11              **4.    Bad Faith**

12         Whether Plaintiffs' failure to seek amendment until this stage of the litigation is the

13  result of mere "undue delay" or "bad faith" is not clear on the present record.  Plaintiffs (1)

14  presented a fairly narrow construction of the allegations in the operative Third Amended

15  Complaint to this Court in a Case Management Statement and in seeking to avoid dismissal,

16  (2) failed to direct this Court to seemingly critical procedural events relevant to their Motion

17  to Amend (such as Judge Zimmerman's and Judge Warren's rulings shaping the scope of

18  relevant discovery), and (3) did not promptly seek amendment even after Judge Warren made

19  inescapably clear that amendment was necessary.  In any case, this Court need not find bad

20  faith to deny leave to amend where, as here, Plaintiffs unduly delayed seeking amendment

21  and HP would be prejudiced.

22  //

23

24         [6] Plaintiffs cite Moore v. Old Canal Financial Corp., No. CV05-205-S-EJL, 2006 WL 851114
    (D. Idaho Mar. 29, 2006) and Jimenez v. Sambrano, No. 04cv1833 L(PCL), 2009 WL 937042 (S.D. Cal.
25  Apr. 6, 2009) in support of their assertion that HP will not be prejudiced by their "clarification"
    amendment.  Both of these cases are distinguishable as both involved *pro se* plaintiffs, and the court
26  found that the proposed amendments (in Moore to "clean up" allegations already made by a *pro se* party
    and in Jimenez to add a claim for punitive damages) did not materially change the lawsuit.

27

28         [7] Plaintiffs point out correctly that discovery is not technically closed and no trial date has been
    set.  The reality, however, is that extensive discovery has already taken place, and Plaintiffs did not seek
    amendment until after HP filed its Motions for Summary Judgment.

1        **5.      Futility**

2        This factor is not relevant here because the sought after amendment does not add

3    claims.  Rather, it expands the factual universe that might support existing claims.

4        **D.      Conclusion Re Motion For Leave To Amend**

5        Plaintiffs either took a calculated risk by framing their case narrowly in the hopes that

6    class certification would be appropriate or unreasonably failed to appreciate that their broad

7    understanding of the scope of their case was not being shared by HP or the Court.  In either

8    case, now that the "computer glitch" theory has not panned out, Plaintiffs are trying to refit a

9    new theory within their existing Complaint.  But given the stage of this litigation and the

10   extensive discovery already taken, this type of bait and switch tactic is not acceptable.

11   Accordingly, leave to amend is DENIED.

12   **II.      MOTIONS FOR SUMMARY JUDGMENT**

13       HP has filed Motions for Summary Judgment directed to each named Plaintiff,

14   arguing that none has sufficient (or any) evidence to create a genuine dispute of material fact

15   as to whether s/he was not paid everything s/he was owed.  Plaintiffs' opposition is based

16   almost exclusively on evidence that, as a general matter, HP experienced problems with its

17   incentive pay system and those problems were widespread.[8]  Because Plaintiffs lack

18   sufficient evidence to create a triable issue as to whether they were actually harmed by any of

19   the problems HP experienced, HP is entitled to summary judgment.

20       **A.      Background**

21           **1.      The Basics Of HP's Compensation System**

22       HP's sales representatives operated under unilateral, at-will employment contracts.

23   Wesoky Decl. (dkt. 191) Ex. 10.  Under those contracts, sales representatives received a base

24   salary, incentive pay based on sales, and additional performance bonuses based on sales.  Id.

25   Ex. 11.  Each sales representative was assigned a territory and/or specific customers, and

26   ───────────────

27       [8] HP has objected to almost all the evidence produced by Plaintiffs.  See generally  Dkt. 218.
     Generally speaking, HP asserts that all or nearly all of Plaintiffs' evidence is irrelevant (or its limited
     relevance is outweighed by its prejudicial effect), unauthenticated (even though it was produced by HP),
28   and hearsay.  It is not necessary to rule on these Objections because, even assuming the evidence is
     admissible, Plaintiffs still have failed to create a genuine dispute of material fact.

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

they worked that territory and/or those customers.  Id. Ex. 13.  Sales representatives were

supposed to receive credit and incentive pay on sales of identified product lines made in their

assigned territory or to their assigned customers.  Id. Ex. 14. Incentive pay for certain sales

representatives was calculated on the basis of a ratio between an initial sales target ("quota")

and actual sales made.  Id. Ex. 15.  Properly calculating a particular representative's

incentive pay thus required knowing (1) the representative's quota (if he had one); (2) the

product lines for which the representative was to receive credit; and (3) the amount of sales

made in the relevant territory and/or to the relevant customers.[9]  Id. Exs. 15-17.  Sales

crediting occurred when "all required data [was] captured" by HP.  Slaby Decl. (dkt. 145-1) ¶

28 (citations omitted).  Obviously, if HP did not receive the "required data" from the

reporting reseller or partner, or received it "late," a sales representative was not credited for

the sale or the credit was delayed.  Wesoky Decl. (dkt. 191) Ex. 32, July 19, 2010 Pruss

Depo. at 25:16-18.  Sales representatives were supposed to review sales crediting on a

monthly basis and report errors.  Slaby Decl. (dkt. 145-1) ¶ 34 (citations omitted).

Although HP advanced incentive pay (or "draws" as an estimate of incentive pay)[10] on

a monthly basis, incentive pay was not earned unless a sales representative reached his

applicable quota.  Id. Exs. 18; see also Slaby Decl. (dkt. 145-1) ¶¶ 13, 21.  Whether a sales

representative met his quota could not be determined until the close of his performance

period, usually semi-annually or annually.  Ex. 4 to Slaby Decl. (dkt. 145-2) HP 550 Sec. 4.1

("Incentive pay is calculated with period-to-date calculation.  The actual performance

attainment percentage is determined by dividing the cumulative period-to-date sales by the

---

[9] Sales representatives assigned a territory could receive credit for "direct sales" and "indirect sales."  Slaby Decl. (dkt. 145-1) ¶ 23.  "Direct sales" are made by HP directly to a customer.  Id. "Indirect sales" are sales of HP products by "partners" or "resellers" that sell HP products.  Id.  Some partners and resellers were "reporting" and some were "non-reporting."  Id.; Wesoky Decl. (dkt. 191) Ex. 31.  Reporting partners and resellers provided sales data directly to HP; non-reporting partners and resellers did not.  Id.  To receive credit for a non-reporting partner's or reseller's sale, a sales representative was required to submit a manual claim form.  Wesoky Decl. (dkt. 191) Ex. 31.

[10] HP paid draws from the beginning of a fiscal cycle until sales representatives' Sales Letters were issued.  Slaby Decl. (dkt. 145-1) ¶ 36. The Sales Letters "contained the quota, customer/territory assignments, performance metrics, and performance period."  Id. ¶ 16.  Without the Sales Letter, HP could not determine incentive pay, so the draw process was used to approximate incentive pay and even out employees' compensation.

10

United States District Court
For the Northern District of California

1  quota that applies to the entire measure period.").  HP told sales representatives with quotas

2  that "[p]ay advances are considered liabilities and are subject to recovery by HP . . . .  The

3  'performance level threshold' is the stated performance level threshold the sales employee

4  must meet prior to earning the incentive pay that was issued as a pay advance."  Ex. 15 to

5  Slaby Decl. (dkt. 145-2) HP219242.  Further, HP made clear that "the sales employee must

6  meet [the performance level threshold] prior to **earning** the incentive pay that was issued as a

7  pay advance."  Id.

8                    **2.      Omega's Role In HP's Incentive Pay System**

9          Omega is HP's incentive pay calculation system.  Slaby Decl. (dkt. 145-1) ¶ 43.  It

10  receives data from various sources.  Id.  As discussed above, in the Third Amended

11  Complaint and in Opposition to Motions to Dismiss, Plaintiffs asserted that a flaw in Omega

12  caused HP to underpay its employees and/or to pay them late.  See, e.g., Third Am. Compl.

13  (dkt. 69) ¶ 3 ("[T]he Employees . . . seek to enjoin HP from continuing to use the

14  malfunctioning Omega system . . . .").

15          Plaintiffs now assert that the flaw was not with Omega itself – which is now

16  characterized as a "glorified calculator" – but rather with "HP's entire complex

17  compensation system, commonly referred to as Omega[, which] contained multiple, systemic

18  flaws that frustrated any efforts to pay [sales representatives] timely and accurately.

19  Succinctly stated, it was a giant trash compactor in which garbage went in and garbage came

20  out."  Reply in Supp. of Mot. to Amend (dkt. 224) at 1 n.1; Opp'n to Mot. for Summ. J. at i.

21                    **3.      General Evidence Of Problems With HP's Incentive Pay System**

22          Plaintiffs set forth evidence that HP experienced broad based problems in timely and

23  accurately paying its sales force.

24          For example, Plaintiffs point to an internal HP audit that, following a sampling of 25

25  employees, found that representatives were underpaid approximately a quarter million dollars

26  over a three month period because HP was late in getting out Sales Letters.  Wesoky Decl.

27  Exs. 7-8 at HP382963-64, HP382953-54; see also Ex. 25-26 (describing delays in issuance of

28

United States District Court
For the Northern District of California

1   Sales Letters within a particular section of HP); Ex. 27 (August 2009 email describing

2   "overall delays worldwide with variable pay and opening Omega reporting . . . .").

3         Further, reporting customers did not always provide information to HP timely,

4   accurately, or at all, resulting in late, inaccurate, or entirely missed incentive pay.  Id. Ex. 32

5   (Pruss Depo.) 25:16-25 ("Our resellers . . . did not always give us accurate data, and that data

6   would need to be updated occasionally, and there was a process for all of that.  And the

7   internal data from internal HP systems seemed to be accurate most of the time; in other

8   words, I can't think of a situation where that data was ever a problem for [the Compensation

9   group that I managed.]").  For example, in late 2008 Yahoo purchased just under $1 million

10  worth of HP goods from a reseller, but delays in receipt of the information necessary to

11  process the claim resulted in HP rejecting credit for the sale.  Id. Ex. 34 at HP379943-44.

12        Similarly, there were issues in the summer of 2007 with properly crediting sales, and a

13  significant sum of money was backlogged in HP's system.  Id. Ex. 38 (Sept. 21, 2007 email)

14  at HP21419 ("There have been major issues in the US Sales Comp environment: Missing

15  Data – delays in receiving $1.7 Billion data from an upstream system (Vista) which is used to

16  determine pay.  Reporting Unavailability – Sales Reps have had access to their reporting

17  environment 4 from 14 workdays in September and 12 from 23 in August[.]  This has led to

18  high dissatisfaction amongst Sales Reps because they do not get timely visibility of where

19  they are against Quota or get accurate pay in a reasonable timeframe.").  Indeed, 2007

20  appears to have been a particularly problematic year for HP in terms incentive pay.  Id. Ex.

21  40 (Power Point Presentation) at HP4075 ("The aging environment of the IT applications and

22  infrastructure that support Sales Compensation, combined with reductions in IT headcount

23  and their focus on the IT transformation has resulted in a series of IT events throughout

24  FY07 that have impacted timely and accurate compensation to the US Sales Force.") and

25  HP4077 ("Late & Inaccurate payments to sales force [] is #1 sales productivity issue and

26  stated cause for attritions [sic] & ability to attract sales talent."); Ex. 42 (Sept. 11, 2007 Sales

27  Compensation OMEGA Update) at HP4463 ("All US sales reps are affected by poor

28

OMEGA and OOL stability and availability."). HP was still suffering similar issues, at least within pockets of the sales force, well into 2009. Id. Exs. 39, 54-55, 58-62.

### 4. California Plaintiff James Purvis

Purvis was employed by HP starting on April 30, 2007. Thiel Decl. (dkt. 146-1) ¶ 11. He earned a guaranteed annual base salary and was eligible for additional compensation based on commission sales. Id. Purvis was subject to a 60% quota, which meant that he would not be entitled to any incentive pay if he did not hit 60% of his target. Thiel Decl. (dkt. 146-2) Ex. 4; Purvis Depo. (dkt. 184-1) 234, 236 ("[I]f you didn't exceed 60 percent attainment [] you would not be paid any commission."). It is undisputed that Purvis did not attain 60% of his target. Purvis Depo. at 255:11 ("Mark Hurd, himself, wouldn't have been able to hit this quota."). Thus, it is undisputed that, based on the information HP put into Omega, Purvis did not earn any incentive pay.

### 5. Colorado Plaintiff Jeffrey Johnson

Johnson was employed as an Inside Sales Representative from February 18, 2005 through August 1, 2008. Thiel Decl. (dkt. 146-1) ¶ 26. He was paid an annual salary and was eligible for incentive compensation. Id. He was assigned to the State, Local, and Education sales team ("SLED") or a sub-group within that team. Id. ¶ 28. Starting in 2007 and continuing to the end of his employment, Johnson was covered by HP's 60% performance threshold. Slaby Decl. (dkt. 145-1) ¶ 32. Under his sales plans, Johnson was entitled to be credited for direct and indirect volume sales to colleges and universities in his assigned territory. Thiel Decl. (dkt. 146-1) ¶ 29. If the sale was made by a non-reporting reseller, Johnson had to file a manual claim to receive sales credit. Id.

### 6. Colorado Plaintiff Shaun Simmons

Simmons worked as a sales representative from December 2002 to October 2008. Id. ¶ 34. From 2005 through the time he stopped working at HP, he was in HP's Technology

United States District Court
For the Northern District of California

1   Solutions Alliance Group.[11]  McClurg Decl. (dkt. 144-6) ¶ 1.  He received a base salary and

2   was eligible for incentive compensation.  Thiel Decl. (dkt. 146-1) ¶ 34.

3        In FY2005-FY2006, Simmons was assigned to sales of specific HP product lines to

4   IBM.  McClurg Decl. (dkt. 144-6) ¶¶ 5-6; Thiel Decl. (146-1) ¶¶ 36-37.  In FY2006, he was

5   also responsible for sales of certain products to Unisys and Data Return.  In FY2007,[12] he

6   switched to a different type of compensation plan that required that he meet certain

7   objectives set by his manager.  McClurg Decl. (dkt. 144-6) ¶ 9; Thiel Decl. (dkt. 146-1) ¶ 38.

8   In FY2008, Simmons's compensation plan changed again, and his performance was based on

9   two metrics – (1) revenue generated from "sell-to" business (sales directly from HP to certain

10  companies) and (2) "leverage" business (sales by other companies of HP products).

11  McClurg Decl. (dkt. 144-6) ¶ 4; Thiel Decl. (dkt. 146-1) ¶ 39.

12              **7.      Colorado Plaintiff Jennifer Riese**

13       Riese was an Inside Sales Representative in the Personal Systems Group from March

14  27, 2002 to February 27, 2009.  Thiel Decl. (dkt. 146-1) ¶ 18.  She was paid an annual salary

15  and was eligible for incentive compensation.  Id.

16       In FY2005, Riese was responsible for selling personal related systems to small and

17  medium sized businesses.[13]  Id. ¶ 22.  In FY2006, she was assigned to SLED and was

18  responsible for selling volume products to colleges and universities in a defined region in the

19  Southwest and Hawaii.  Id.  In the second half of FY2007, Riese moved to the Agent Group

20  in the Solutions Partner Organization, where she remained until she left HP.[14]  Cannon Decl.

21  (dkt. 144-1) ¶ 1.  At that point, her incentive pay became "team based," and she and her

22

23       [11]Simmons's employment prior to FY2005 is not relevant because of the applicable statute of
    limitations
24
         [12] Starting in 2007 and continuing to the end of his employment, Johnson was covered by HP's
25  60% performance threshold.  Slaby Decl. (dkt. 145-1) ¶ 32.

26       [13]Riese's employment prior to FY2005 is not relevant because of the applicable statute of
    limitations.
27
         [14] Starting in 2007 and continuing to the end of her employment, Riese was covered by HP's
28  60% performance threshold.  Slaby Decl. (dkt. 145-1) ¶ 32 .

group were paid incentive compensation based on sales of products that were "influenced" by their assigned partners in certain regions. Id. ¶¶ 2, 9.

**B.    Legal Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden is on the moving party to demonstrate that there is no genuine dispute with respect to any material fact and that it is entitled to judgment as a matter of law. Id. at 323. A genuine issue of fact is one that could reasonably be resolved in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "material" only if it could affect the outcome of the suit under the governing law. Id. at 248–49.

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything, and summary judgment must be denied. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). If, on the other hand, the moving party has satisfied its initial burden of production, then the nonmoving party may not rest upon mere allegations or denials of the adverse party's evidence but instead must produce admissible evidence that shows that there is a genuine issue of material fact for trial. Id. at 1103. The nonmoving party must "set out 'specific facts showing a genuine issue for trial.'" Celotex, 477 U.S. at 324–25 (quoting Fed. R. Civ. P. 56(c)). If the nonmoving party fails to make this showing, the moving party is entitled to judgment as a matter of law. Id. at 323.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255. However, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)

United States District Court
For the Northern District of California

(internal quotations omitted).  Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.  See id. Further, a "scintilla of evidence" is insufficient to support a non-moving party's position: "there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.  Accordingly, this Court applies essentially the same standard as on a motion for directed verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  When one party tells a story that blatantly disregards the record, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  Scott v. Harris, 550 U.S. 372, 380 (2007).  Mere disagreement or a bald assertion that a genuine issue of material fact exists will not preclude summary judgment.  Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1987).

**C.     Discussion**

**1.     HP Is Entitled To Summary Judgment On Plaintiffs' Breach of Contract Claims**

To survive summary judgment on a breach of contract claim, Plaintiffs must (1) establish the existence of a contract; (2) show that they performed; (3) show that HP failed to perform; and (4) show that they were damaged.  Reichert v. Gen. Ins. Co. of Am., 68 Cal. 2d 822, 830 (1968); W. Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992).[15]  The parties agree that a contract exists, so the question is whether Plaintiffs (or any one or more of them) have enough evidence to establish triable issue(s) as to breach and damage.

//

---

[15] California's choice-of-law rules apply.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Under those rules, Colorado law applies to Colorado Plaintiffs' contract claims.  Cal. Civ. Code § 1646.  Plaintiffs argue that California law (with its longer statute of limitations) applies because there is no difference between the substantive law of California and Colorado as to how to establish breach of contract.  Consol. Opp'n to Mots. for Summ. J. at 8.  Plaintiffs are incorrect.  Section 1646 provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  Cal. Civ. Cod. § 1646.  For the Colorado Plaintiffs, the relevant "place" of performance and/or creation is Colorado.  Thus, Colorado law applies to the Colorado Plaintiffs' breach of contract claims.

16

United States District Court
For the Northern District of California

**a.      Plaintiffs Lack Sufficient Evidence To Create A Triable Issue As To Whether They Were Underpaid In Breach of Contract**

Plaintiffs rely extensively on general evidence of problems in HP's incentive pay system to support their claims of breach of contract.  See generally Opp'n to Mot. for Summ. J. at 10-12; Consol. Opp'n to Mots. for Summ J. at 14-15.  The rhetorical power of that evidence notwithstanding, it is insufficient to create a triable issue of fact as to whether HP breached its contract with Plaintiffs (or any one or more of them) by not paying incentive pay that they were owed.  This is because Plaintiffs do not link HP's problems with actual failure to pay them what they were owed under their sales contracts.

California Plaintiff Purvis.  Purvis never achieved his 60% quota and, thus, never earned any incentive pay.  Purvis Depo. at 255:11.  Therefore, the only way he can show an underpayment in breach of contract is if he has evidence that he did not receive credit for sales he should have been credited for and that, if credit had been properly applied, he would have met his quota.  Purvis lacks this evidence.  Purvis Rogs., Resp. No. 2 (dkt. 142-4) (cannot "identify specific compensation payments that were denied"); see also Purvis Depo. (dkt. 184-1) 197:20-199:6; 203:4-18; 205:19-206:19; 215:11-216:17.

The closest Purvis comes to evidence supporting his claim that he was not paid incentive pay that he was owed is his personal estimate, "based on his memory and recollection, that he suffered a reduction in the commission to which he was entitled that was in the neighborhood of ten percent due to the Omega system's errors," Wesoky Decl. (dkt. 191) Ex. 95 (Interrogatory Resp. No. 9).  This is insufficient to create a genuine issue of fact as to whether HP failed to pay Purvis incentive pay that he was owed.  It is wholly conclusory, contradicts admissions he made during his deposition, appears to be based on an HP reconciliation for a group that Purvis had no relationship with, and does not show that Purvis would have met his quota if credit had been properly applied.  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991) ("[T]he general rule . . . is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); see also Morton Decl. (dkt. 144-8) ¶¶ 2-6 ("The DesignJet Business in which I work is a small, unique segment of HP's Graphics Solutions Business . . . . . . .  The DesignJet Business

United States District Court
For the Northern District of California

1  employs fewer than 30 sales representatives and sales managers in the United States. . . . .

2  [A 2009] reconciliation [for the first half of FY 2009] revealed that the quota had been set

3  too high . . . .  For the first half of fiscal year 2009, I calculated that an 'uplift' of 10% was

4  appropriate to permit the credited shipment data to accurately correspond to the quotas as set.

5  . . . .  We have subsequently calculated and applied similar uplifts – ranging from 1% to 16%

6  – for the second half of fiscal year 2009, and first half of fiscal year 2010.  . . . .  None of [the

7  Plaintiffs] was a sales representative within the DesignJet business.") (emphasis added).

8         Purvis also says that one of his team members was tasked with submitting manual

9  claims for the team so that they would be credited properly for sales requiring manual claim

10  submission.  Wesoky Decl. (dkt. 191) Ex. 95 (Interrogatory Resp.  No. 9).  Accepting that as

11  true, it does not show that HP failed to credit properly submitted manual claims or that, if it

12  did, proper crediting would have pushed Purvis across the 60% threshold.

13         Purvis also relies on deposition testimony from John Rhodes and Shawn Manley to

14  support his contention that he was not credited properly for sales.  But the cited testimony

15  does not help him.

16         Rhodes admitted that he does not know what Purvis was credited for.

17         **Q.  Can you identify a transaction that you know that James
       Purvis was supposed to have been credited for, but was not?**
18      **A.  I specifically couldn't, because I didn't worry about
       James Purvis.**  I worried about John Rhodes and what I was
19      selling.  But I did see one, going through the emails with Epicore
       [phonetic] software, and he was arguing about that.  And I did see
20      that e-mail.  So yeah, that's one I can tell you.
       Q.  Do you recall anything about the – what he was saying about
21      Epicore software?
       A.  I never talked about it.  I just happened to see an email in
22      there that he brought up.
       **Q.  And so you don't know if he eventually was credited for
23      that?**
       **A.  Nope.**
24
   Rhodes Depo. (dkt. 202-1) 39:15-40:9 (emphasis added).
25
          Manley did provide a spreadsheet that he claims shows that certain sales were not
26
   credited to Purvis (among others).  Manley Depo. (dkt. 202-2) 102:18-104:11; 106:20-107:6.
27
   However, neither Manley's generalized assertions regarding crediting problems, nor the
28
   spreadsheets themselves (even assuming the spreadsheets are admissible), explain how HP

18

United States District Court
For the Northern District of California

1    breached its contract with Purvis.  For example, all but a few of the amounts in the

2    spreadsheet fall below the minimum threshold for manual claims.  Id.  Further, sales

3    requiring submission of a manual claim form are not identified, nor does the spreadsheet say

4    whether, if a manual claim form was required, one was properly filled out and filed.

5    Additionally, the spreadsheet does not show that Purvis would have met his performance

6    threshold.

7           Colorado Plaintiff Johnson.  Johnson does not have sufficient evidence to create a

8    triable issue as to whether HP breached its contract by underpaying him.  Johnson notes that

9    HP has "admit[ed that] Johnson identified sales to Hackensack Medical Center for which he

10   did not receive credit."  Consol. Opp'n to Mots. for Summ. J. at 13.  Although true, it is

11   undisputed that that sale fell below HP's minimum threshold for manual claims.  Slaby Reply

12   Decl. (dkt. 217-4) ¶ 5.

13          Johnson argues that there is a dispute of fact as to whether the minimum threshold is a

14   part of Plaintiffs' contracts because (1) an HP audit found that not all claims below the

15   minium threshold were rejected and (2) HP told employees that there was no minimum

16   threshold.  Consol. Opp'n to Mots. for Summ. J. at 13; Wesoky Decl. (dkt. 191) Ex. 85-86.

17   Even assuming that Johnson's evidence is admissible, it does not create a jury question as to

18   whether the minimum threshold was a part of Plaintiffs' contracts.  First, Plaintiffs

19   acknowledged that the minimum threshold was a part of their contracts in the Third

20   Amended Complaint and during discovery.  Third Am. Compl. (dkt. 69) ¶ 33 ("During the

21   time period at issue in this lawsuit, sales representatives could not submit an invoice

22   manually unless the sale met a certain threshold amount . . . .");  Johnson Resp. to

23   Interrogatory16 ("HP's policy that no manual claim could be submitted unless it met a

24   certain dollar threshold, e.g., $10,000[,] resulted in Plaintiff being paid less than earned.").

25   Second, the fact that an HP audit showed that HP paid some manual claims below the

26

27

28

United States District Court
For the Northern District of California

threshold does not show that HP waived the minimum threshold requirement for all sales representatives.[16]

Finally, Johnson's personal estimate that he was underpaid "approximately 5% of his annual commissions" does not create a genuine issue of fact as to whether HP underpaid him in breach of contract.  Like Purvis, Johnson has no evidence of any instance in which he was not credited properly.  The 5% figure is entirely unsubstantiated as to Johnson and is akin to simply asserting that a genuine dispute of facts exists, which is insufficient.[17]  See Scott, 550 U.S. at 380.

Colorado Plaintiff Simmons.  Simmons also lacks sufficient evidence to create a triable issue of fact as to whether HP failed to pay him everything he was owed.  Prior to a Declaration submitted in opposition to HP's Motion for Summary Judgment, Simmons had not identified any improperly denied credit.  Simmons Depo. (dkt. 142-3) 38:22-39:1 ("Q. [W]hen you were at HP, did you ever see a transaction that didn't show up on OMEGAonline at all?  A.  To the best of my recollection right now, I'm not able to ascertain yes or no.").  In his Declaration submitted in opposition to summary judgment, however,

---

[16] Johnson relies on an email string to try to show that HP told employees that there was no minimum threshold.  But this email string does not involve him, was sent after he left HP, and appears to relate to a division he never worked in.  See Wesoky Decl. (dkt. 191) Ex. 86.

[17] Johnson also cites the deposition testimony of Bridget Praytor to support his claim that he was underpaid.  But her testimony (which is likely inadmissible hearsay) is as unhelpful as Johnson's in identifying actual sales for which Johnson should have received credit but did not.

> Q.  Do you have any knowledge whether Jeffrey Johnson experienced any problems with incentive compensation while he was employed with HP?
> A.  Yes.  I heard about it on a daily basis.
> Q.  What did he tell you?
> A.  Him, as well as every other sales rep I worked for, said on a regular basis that they weren't being paid properly.
> **Q.  Did he tell you anything specific?**
> **A.  No.**
> Q.  Do you know if Jeffrey Johnson ever filed a manual claim?
> A.  No.  I don't know.
> **Q.  Do you know any specific sale that Jeffrey Johnson should have been credited for but was not?**
> **A.  No.  I don't know.**

Praytor Depo. (dkt. 202-3) 57:3-22 (emphasis added).

20

1   Simmons asserts that "[i]n 2007, I was underpaid nearly $17,000 for my role as an

2   'influencer' on transactions with The Hartford.  Instead of paying me the owed amount of

3   over $17,000, HP only paid me $200."  Simmons Decl. (dkt. 192-1) ¶ 6.

4         Simmons's Declaration does not create a genuine issue of material fact as to whether

5   he was underpaid in breach of contract because (1) it is completely conclusory and amounts

6   to a generalized assertion that a dispute exists; and (2) it contradicts earlier admissions that

7   Simmons could not identify any missing credit and provides no explanation for the

8   inconsistency.  Kennedy, 952 F.2d at 266 ("[T]he general rule . . . is that a party cannot

9   create an issue of fact by an affidavit contradicting his prior deposition testimony.").

10        Colorado Plaintiff Riese.  Riese is similar to her co-Plaintiffs in lacking evidence that

11  HP failed to credit her properly for sales.  For example, in her deposition Riese could not

12  identify instances in which she was improperly denied bonuses she was owed.  Riese Depo.

13  (dkt. 142-3) 186:6-9 ("Q.  Do you believe that there were bonuses that you should been paid

14  that you were not paid?  A.  There might be.  Again, without having HP's – allowing me to

15  see the data, possibly.").

16        In her Declaration submitted in opposition to HP's Motion for Summary Judgment,

17  Riese says that "as documented in the attached string of emails, I was not paid for addition

18  [sic] sales made through Ingram to Agilysis."  Riese Decl. ¶ 5, Ex. 1.  But the email string

19  does not show that Riese was not paid for the Ingram/Agilysys sales.  Rather, it shows that

20  she was involved in discussions about whether she was going to receive credit.  That credit

21  was ultimately given.  See Cannon Reply Decl. (dkt. 217-12) ¶ 5 ("I approved the Post-Agent

22  Addition requesting payment for Invoice Number 41723898 and submitted it to the Program

23  Office such that the order could be linked to Riese and the Central Agent team to which she

24  was assigned."), Exs. 1-2.  There is no evidence, other than Riese's conclusory statement and

25  the email string that does not support it, that HP failed to credit Riese properly for the

26  Agilysys/Ingram sales.

27  //

28  //

* * *

Plaintiffs make two primary arguments as to why the foregoing recitation of the state of the record does not entitle HP to summary judgment on the claim that HP breached its contract by underpaying them.

First, Plaintiffs argue that they need only show the fact of damage rather than the amount of damage and that they have satisfied their burden via the general evidence of problems in HP's incentive pay system.  Opp'n to Mot. for Summ. J. at 13-14 (citations omitted).  This argument is not persuasive because the general evidence does not establish even the fact of damage as to these Plaintiffs.  To the contrary, as discussed above, Plaintiffs have not set forth sufficient evidence to create a triable issue as to whether any one of them was not properly credited for sales.  They also have not connected any failure to pay them (assuming such failure occurred) with an Omega malfunction or a contractual breach.

Second, Plaintiffs attempt to shift the blame for their failure to have sufficient evidence to HP.  They do so by asserting that HP has refused to provide them the data necessary to conduct the analysis that would show that HP failed to credit them properly.  Opp'n to Mot. for Summ. J. at 13 ("Purvis has not been able to more specifically identify other sales for which he should have received, but did not receive, [credit] because HP refuses to provide the requested information."); Consol. Opp'n to Mots. for Summ. J. at 24 ("Plaintiffs have not been able to more specifically identify other sales for which they should have received, but did not receive, [credit] because HP refuses to provide the requested information"); See Fed. R. Civ. P. 56(f).  Plaintiffs want to take additional discovery to obtain this "raw data" to augment the record.  Consol. Opp'n to Mots. for Summ. J. at 24-25.

Plaintiffs' argument is not persuasive because the reason they do not have the raw data is that HP's discovery responses have been shaped by Magistrate Judge Zimmerman's and Special Master Warren's rulings interpreting the scope of the operative Third Amended Complaint.  (Rulings with which this Court is in full agreement.)  Specifically, because those rulings construed the Third Amended Complaint as alleging Omega malfunctions, HP has for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the most avoided having to turn over raw data regarding input into Omega.[18]  Thus, whether Plaintiffs are entitled to the raw data folds back into the question whether Plaintiffs should be granted leave to amend.  As discussed above, leave to amend will not be granted.  Accordingly, the Court will not defer ruling on HP's Summary Judgment Motions to allow Plaintiffs to take discovery that, in the Court's view, is outside the scope of the operative Complaint.  See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1291-92 (9th Cir. 2000) (theories of liability must be alleged in the complaint because it "guides the partes' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

### b.   Plaintiffs Lack Sufficient Evidence To Create A Triable Issue As To Whether They Were Paid Late In Breach Of Contract

In addition to arguing that they were underpaid, Plaintiffs also argue that they were paid late.[19]  Specifically, Plaintiffs assert that they were entitled to credit for sales upon "shipment" and that incentive pay was therefore "earned," at the latest, upon shipment.  Opp'n to Mot. for Summ. J. at 14-17; Consol. Opp'n to Mots. for Summ. J. at 15-18.  On that theory, earned incentive pay was paid late because payment occurred well after shipment in many cases.

---

[18]  After HP's Summary Judgment Motions and Plaintiffs' Motion to Amend were filed, Judge Warren ordered  HP to turn over "raw sales and delivery information" "that Plaintiffs can use to prove that they were not properly credited for sales . . . ."  DMO 10 (dtk. 210) at 1-2.  Specifically, Judge Warren ruled that:

> [a]lthough the efficacy of the following statement may turn on the Court's ruling on Plaintiffs' pending Motion to Amend, Plaintiffs argue that their case will ultimately be that they haven't been properly paid because, at least in part, the raw data fed into the computers was fed late (or was otherwise untimely), was wrong or, in some cases, wasn't fed into them at all.  They want production of the raw data itself so that they can run the relevant calculations using their own experts.  This information is relevant and discoverable.

Id. at 2 (emphasis added).  The Court agrees with Judge Warren that the propriety of his ruling in DMO 10 turns on this Court's disposition of Plaintiffs' Motion to Amend, which the Court has denied.

[19]  None of the Colorado Plaintiffs alleged in the Complaint that they were paid late in breach of contract.  That alone is reason enough to grant HP summary judgment on that theory.  See Coleman, 232 F.3d at 1291-92.   However, the Court assumes for the sake of argument that the issue of late payments is part of the Third Amendment Complaint for all Plaintiffs.

United States District Court
For the Northern District of California

1    Plaintiffs' argument relies primarily on language from HP's "Global Sales

2  Compensation Policy."  In a section entitled Sales Credit Eligibility Notes, it provides that

3  "[g]enerally, sales credit for hardware and software products is provided based on ship date."

4  Weosky Decl. (dkt. 191) Ex. 23 at HP831.  The very next sentence in the Global Sales

5  Compensation Policy says that "[a]lternatively, sales credit may be based on revenue date,

6  invoice date or HP-reported margin in some business models and/or based on performance

7  measures identified in the employee's Sales Plan."  Id. (emphasis added).  Plaintiffs'

8  contracts also provided for performance periods affecting when/whether incentive pay was

9  earned and, after the 60% quota was put in place, Plaintiffs were not entitled to any incentive

10  pay if they failed to meet their quota.  Slably Decl. (dkt. 145-2) Exs. 3-5.  Therefore, even

11  assuming that Plaintiffs were entitled to "credit" for a sale upon shipment, that credit did not

12  translate into "earned" incentive pay until Plaintiffs' performance period was over.[20]  See,

13  e.g., Nein v. HostPro, Inc., 174 Cal. App. 4th 833, 853 (2009) ("[F]or purposes of enforcing

14  the provisions of the Labor Code, '[t]he right of a salesperson or any other person to a

15  commission depends on the terms of the contract for compensation'") (citations omitted).

16    Plaintiffs also lack any evidence of incentive payments paid "late" in breach of

17  contract.  Purvis admits that he has no such evidence.  Purvis Depo. (dkt. 184-1) at 173:3-11.

18  Johnson says that he recalls two specific transactions where commissions were delayed for

19  approximately three months.  Johnson Decl. (dkt. 192) ¶ 5.  However, he provides no

20  accompanying facts regarding these transactions nor does he identify any particular

21  contractual provision these "delayed" incentive payments violated.  Similarly, Simmons's

22  Declaration asserts that he sold $12 million worth of products to GMAC in 2007, and his

23  commission was delayed 8 months.  Simmons Decl. (dtk. 192-1) ¶ 4.  HP has submitted un-

24

25    [20] Plaintiffs argue that the foregoing analysis violates California law because "[a] commission
   is earned . . . when all of the legal conditions precedent have been met."  Opp'n to Mot. for Summ. J.
   at 15-16; Consol. Opp'n to Mots. for Summ. J. at 16-17 (citing Division of Labor Standards
26  Enforcement Policies and Interpretations Manual).  First, California law applies only to Purvis.  Second,
   even if the Division of Labor Standards interpretation had the force of law, it merely establishes that
27  Purvis did not earn incentive pay until after all the legal preconditions in his contract were met.  Among
   those legal preconditions was the requirement that he meet his quota.  The determination whether he met
28  his quota could not be made until the end of his performance period.  Thus, Purvis could not have
   "earned" incentive pay until, at the earliest, the end of the performance period.

United States District Court
For the Northern District of California

controverted evidence that the crediting process for sales of the type described by Simmons takes as long as five months and that Simmons was paid for the credited sales well within that time frame.  See McClurg Reply Decl. (dkt. 217-3) ¶ 7-10.  Finally, Riese also lacks evidence that she was paid late.  Riese Depo. (dkt. 142-3) 34:20-25 ("Q.  And did your understanding of the deal have a time limit for when you would be paid?  A.  No.  We got paid our base and any commission . . . ."); 35:10-21 (similar).  Notwithstanding her deposition testimony, Riese asserts in her Declaration that she was paid late for Agilysys influenced transactions.  Riese Decl.  There is no factual context for this assertion or explanation of how it breaches Riese's contract.  In addition, Riese argues in the Consolidated Opposition (but does not say in her Declaration) that her incentive pay was delayed three months in FY2007 because she was mistakenly assigned to the wrong sales plan.  Consol. Opp'n to Mots. for Summ. J. at 14.  HP has submitted un-controverted evidence that the error was corrected while Riese was still receiving draw payments (which she would have received regardless of which sales plan she was on) and that the error "had no impact on Riese's incentive payments."  Slaby Reply Decl. (dkt. 217-4) ¶ 6.

Thus, HP is entitled to summary judgment on the breach of contract claim to the extent based on alleged late payments because Plaintiffs offer nothing other than wholly conclusory, unsupported Declarations[21] insufficient to allow a jury to rule in their favor.

* * *

As they did with respect to their theory that they were not paid all they were owed, Plaintiffs attempt to get around the lack of evidence of late payment by arguing that they need not show that they were personally paid late because they have evidence that, as a general matter, incentive payments were delayed, delays were class-wide, and delays resulted in Plaintiffs receiving "draws" rather than incentive pay.  Opp'n to Mot. for Summ J. at 12.

___

[21] Simmons and Riese were each issued checks by HP after their employment concluded. Consol. Opp'n to Mots. for Summ J. at 14.  This does not create a triable issue on late payments for three primary reasons. First, Simmons and Riese each received what they were owed (approximate $300 and $600 respectively) plus interest.  Second, and perhaps more critically, neither Simmons nor Riese connect these "late" payments to any Omega malfunction or breach of any contractual provision.  Third, neither Simmons nor Riese even alleged in the operative Complaint that late payments caused a breach.

United States District Court
For the Northern District of California

1    None of that constitutes evidence that Plaintiffs were paid "late" in breach of contract.  Even

2    granting that Plaintiffs have evidence that they received "draws" rather than incentive pay

3    during the time period between the beginning of a fiscal year and when Sales Letters were

4    issued, they have not shown how the payment of draws harmed them.  Purvis never earned

5    incentive pay, and no other Plaintiff has shown that s/he received less in draws than what

6    s/he would have received in incentive payments or that HP failed to "reconcile" incentive

7    pay with the draw payments after Sales Letters were issued.  See generally Slably Decl. (dkt.

8    145-2) Ex. 3.  Further, Plaintiffs' contracts authorized the payment of draws.  See Wesoky

9    Decl. (dkt. 191) Ex. 18 at HP70623-24.

### c.       Plaintiffs Lack Evidence That HP Breached The Implied Covenant Of Good Faith And Fair Dealing

11          "Every contract imposes upon each party a duty of good faith and fair dealing in its

12   performance and its enforcement."  Carma Dev. (Cal.), Inc. v. Maratho Dev. Cal., Inc., 2 Cal.

13   4th 342, 371 (1992).  The covenant applies "where one party is invested with a discretionary

14   power affecting the rights of another.  Such power must be exercised in good faith."  Id. at

15   371-72.  In Colorado, "there is no cause of action for breach of implied covenant of good

16   faith and fair dealing in employment situations[.]"  Marsh v. Delta Air Lines, 952 F. Supp.

17   1458, 1464 (D. Colo. 1997).  Thus, California Plaintiff Purvis is the only Plaintiff with a

18   possible claim based on breach of the covenant of good faith and fair dealing.[22]

19          Purvis claims that he had "a right to be paid commissions on all direct and indirect

20   sales of identified HP products within a specific territory (or to specified customer)" pursuant

21   to his contract with HP.  Opp'n to Mot. for Summ. J. at 19.  He further asserts that HP

22   breached this right by (1) imposing an unduly onerous manual claims process which, as a

23   practical matter, was impossible to comply with; (2) delaying issuance of quotas, causing

24   draws to be paid rather than incentive payments; and (3) withholding hundreds of millions of

25   dollars from the sales crediting process.

---

[22] Assuming, argenudo, that Colorado law recognizes Colorado Plaintiffs' implied covenant theory, the following analysis applies to them as well.

26

United States District Court
For the Northern District of California

Purvis has no evidence that HP underpaid him or paid him late as a result of the manual claims process, any delay in issuing quotas, or the withholding of money from the crediting process.  As discussed above, Purvis has not identified underpayments or late payments, let alone any caused by the manual claims process, any delay in issuing Sales Letters (causing draws to be paid), or any failure to submit proper crediting information to Omega.  Nor, on a more fundamental level, has Purvis shown how a rational jury could rule in his favor on the implied covenant theory.

First, the manual claims process is a part of Purvis's contract with HP.  Third Am. Compl. (dkt. 69) ¶ 33 ("During the time period at issue in this lawsuit, sales representatives could not submit an invoice manually unless the sale met a certain threshold amount."); Slaby Decl.(dkt. 145-2, 3) Ex. 7 at HP312 ("Credit for indirect business through a non-reporting partner would need to be submitted and approved via a manual claim . . . ."), Ex. 8 at HP885 ("All criteria of the [manual] claim must be met prior to submission.  Standard criteria applicable to all claims are as follows: quota deployment, documented sales effort, shipment/invoice/order validation, supporting documentation, and required approvals.  Minimum thresholds (which apply to US claims only) are per order/invoice and there is no bundling of orders to meet thresholds."), Ex. 9 at HP900 (same).  Moreover, there is insufficient evidence that HP exercised contractual discretion to make the manual claims process unreasonably burdensome.

Second, payment of draws pending issuance of Sales Letters was also a part of Plaintiffs' contracts.  See, e.g., Slaby Decl.(dkt. 145-2) Ex. 4 at HP549 ("Sales Letters will be issued to all sales employees as early as possible in the measure period."); Slaby Decl. (dkt. 145-1) ¶ 36 (citing policy language providing for payment of draws).  Even assuming Plaintiffs have shown that draws were paid for longer periods than anticipated by HP's sales representatives (and HP itself), they have not produced evidence to allow a jury to conclude that those delays (1) caused them harm (i.e. that draw payments were less than what their incentive payments would have been and that any difference was not corrected once Sales Letters were issued) or (2) resulted from HP's bad faith discretionary decisions.  Likewise,

27

1    Plaintiffs lack evidence from which a jury could rationally conclude that HP's "suspense

2    process" – in which certain transactions were not promptly forwarded to Omega – breached

3    HP's good faith obligations.  HP has a provided a seemingly plausible explanation for why

4    the "suspense process" occurred, <u>see</u> Reply (dkt. 216) at 31-33, but even if it had not done so,

5    Plaintiffs have insufficient evidence to show that the suspense process was a discretionary act

6    done in bad faith or that they were harmed by it.

### 2. The Promissory Estoppel And Unjust Enrichment Claims Are Not Viable Because A Contract Exists

7
8    Plaintiffs have acknowledged that, because "HP has admitted that it had contracts with

9    Purvis[, t]he existence of contracts precludes claims for promissory estoppel and unjust

10   enrichment."  Opp'n to Mot. for Summ. J. at 21 n.8.  Accordingly, HP is entitled to summary

11   judgment on Plaintiffs' promissory estoppel and unjust enrichment claims.

### 3. California Labor Code Claims: §§ 223, 218, 204, 226, 2926-2927, 201-203, And 2698 <u>et seq.</u>

12
13
14   California Plaintiff Purvis also brings several claims under the California Labor Code.

15   HP argues that (1) none of the Labor Code sections create a private right of action;[23] and (2)

16   even if there is a private right of action, Purvis lacks evidence sufficient to create a genuine

17   issue of material fact as to whether HP violated any section of the Labor Code.  HP is entitled

18   to summary judgment on Purvis's California Labor Code claims for the reasons that follow.

19   <u>Sections 201-203</u>.  These sections provide for the timely payment of wages upon

20   discharge.  On their face, they appear to contemplate a private right of action.  Cal. Labor

21   Code § 203(a)-(b) ("If an employer willfully fails to pay, without abatement or reduction, in

22   accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who

23   is discharged or who quits, the wages of the employee shall continue as a penalty . . . . [and

24   s]uit may be filed for these penalties at any time before the expiration of the statute of

25   limitations on an action for the wages from which the penalties arise.").  Thus, the Court

26   assumes *arguendo* that sections 201-203 permit private rights of action to recover unpaid

27
28       [23] As a general matter, a private right of action exists if the statute, in "clear understandable, unmistakable terms," indicates an intent to create such a right.  <u>Vicko Ins. Serv. Ins. v. Ohio Indem. Co.</u>, 70 Cal. App. 4th 55, 62-63 (1999).

United States District Court
For the Northern District of California

1  wages as a penalty.  See Kamar v. RadioShack Corp., No. CV 07-2252 AHM (AJWx), 2008

2  WL 2229166, at *2 n.3 (C.D. Cal. May 15, 2008) ("RadioShack does not dispute that a

3  private right of action exists to bring claims for unpaid wages and overtime and failure to

4  timely pay wages upon discharge, pursuant to Labor Code sections 201, 202, and 203 . . . .").

5      Notwithstanding the existence of a private right of action, HP is entitled to summary

6  judgement on Purvis's claims under sections 201-203 because he lacks evidence that HP did

7  not pay him everything he was owed.

8      Section 204.  Section 204 requires the payment of wages in a timely manner; it does

9  not provide a right to wages.  The remedy for violation of section 204 is found in section

10  210, which provides that "every person who fails to pay the wages of each employee as

11  provided in Section 204 . . . shall be subject to a civil penalty."  Cal. Labor Code § 210.  See

12  also Singer v. Becton, Dickinson and Co., No. 08cv821 IEG (BLM), 2008 WL 2899825

13  (S.D. Cal. July 25, 2008).  Section 210 goes on to say that "[t]he penalty shall be recovered

14  by the Labor Commissioner as part of a hearing held to recover unpaid wages and penalties

15  pursuant to this chapter or in an independent civil action . . . brought in the name of the

16  people of the State of California and the Labor Commissioner and the attorneys thereof may

17  proceed and act for and on behalf of the people in bringing these actions."  (Emphasis

18  added.)  There is nothing in section 204 or 210 that indicates, in "clear understandable,

19  unmistakable terms," that a private right of actions exists for violations of section 204.  In

20  any case, Purvis lacks evidence that HP failed to pay him or did not pay him timely.

21      Section 218.  This section provides in relevant part that "[n]othing in this article shall

22  limit the right of any wage claimant to sue directly or through an assignee for any wages or

23  penalty due him under this article."  This section creates a private right of action, at least for

24  recovery of certain types of wages or penalties provided for under the Labor Code.  See No.

25  CV 07-2252 AHM (AJWx), 2008 WL 2229166, at *7 (C.D. Cal. May 15, 2008) ("Section

26  218 . . . clearly contemplates that wage claimants have a private right of action of some kind,

27  but it is ambiguous as to what wages that private right of action encompasses."); see also

28  Guess v. U.S. Bancorp, No. C 06-7535 JF (RS), 2007 WL 1345194, at *3 (N.D. Cal. May 8,

United States District Court
For the Northern District of California

2007) (there is a private right of action under Labor Code Section 226.7 and "a number of California appellate decisions have cited § 218 for the proposition that wage claimants have a direct right of action to seek unpaid wages.") (citations omitted).  Thus, although section 218 does not create a right to particular wages or penalties, it suggests the existence of a private right of action to enforce other sections of the Labor Code.

Section 223.  Section 223 prohibits the secret payment of a lower wage while purporting to pay the wage required by statute or contract.  The text of section 223 does not support the existence of a private right of action.  Nor does section 223 create an entitlement to wages or specific penalties.  Thus, section 223 does not create a private right of action, even in combination with section 218, because it does not set forth an entitlement to a wage or provide a penalty.  In any case, Purvis has no evidence that HP "secretly" paid a lower wage "while purporting to pay the wage designated by . . . [his] contract."  Cal. Labor Code § 223.

Section 226.  This section requires the furnishing by an employer to an employee of an "itemized statement" containing specified information about the employee's pay.  Subparts (e) - (g) of this section suggest that a private right of action exists.  Those subparts expressly provide for (1) specified damages recoverable by the employee, (2) penalties recoverable by the employee; and (3) "an action for injunctive relief to ensure compliance with this section . . . ."  Nevertheless, HP is entitled to summary judgment on Purvis's section 226 claim because he has not identified any pay statements that were not accurate.  See White v. Starbucks Corp., 497 F. Supp. 2d 1080, 1089-90 (N.D. Cal. 2007).

Section 2926-27.  Section 2926 provides that "[a]n employee who is not employed for a specified term and who is dismissed by his employer is entitled to compensation for services rendered up to the time of such dismissal" and 2927 provides that "[a]n employee who is not employed for a specified term and who quits the service of his employer is entitled to compensation for services rendered up to the time of such quitting."  These sections appear to provide a substantive right to wages, and even though the language of the statutes is not unmistakably clear, the Court assumes that a private right of action exists.

United States District Court
For the Northern District of California

1  Once again, however, HP is entitled to summary judgment.  First, Purvis was not "dismissed

2  by his employer," so section 2926 does not apply to him at all.  Second, he has no evidence

3  that HP failed to pay him "compensation for services rendered up to the time" he left, so HP

4  is entitled to summary judgment on the section 2927 claim as well.

5         Section 2698 et seq.  These sections, known as the Private Attorney General Act

6  ("PAGA"), allow "an aggrieved employee on behalf of himself" to recover civil penalties

7  due under "any provision of this code . . . ."  Although it does not create a substantive right to

8  wages, PAGA does provide a private right of action when a Labor Code section provides for

9  a penalty.  Here, sections 201-203 and 226, as discussed above, provide for penalties.

10  Further, Labor Code Section 2699(f) provides "default" penalties for any section that does

11  not already include one.  Thus, suit is authorized under PAGA to recover these penalties if

12  the plaintiff meets certain conditions.  That said, because HP is entitled to summary judgment

13  on Purvis's Labor Code claims, it is also entitled to summary judgment on Purvis's PAGA

14  penalties claim as well.  Elliot v. Spherion Pac. Work, LLC, 572 F. Supp. 2d 1169, 1180-81

15  (C.D. Cal. 2008); Price, 2011 WL 16977, at *6.

16            **4.     Colorado Labor Code Claims: §§ 8-4-109, 8-4-103, 8-4-105**

17         Colorado Plaintiffs have asserted claims under Colorado's wage and employment

18  statutes.  HP is entitled to summary judgment on these claims.

19         Section 8-4-109.  Section 8-4-109(1)(b) provides that "[w]hen an employee quits or

20  resigns such employee's employment, the wages or compensation shall become due and

21  payable upon the next regular payday."  Compensation must be earned and unpaid before

22  section 8-4-109(1)(b) applies.  Lee v. Great Empire Bd., Inc., 794 P.2d 1032, 1034 (Colo.

23  App. 1990) ("The wage statute applies only to those wages and compensation that are

24  'earned and unpaid' at the time of the employee's discharge.") (citation omitted).

25         A prerequisite to recovery under section 8-4-109 is making a written demand for

26  unpaid wages within 60 days after employment ends.  Colo. Rev. Stat. § 8-4-109(3)(a) & (d)

27  ("If an employer refuses to pay wages or compensation in accordance with subsection (1) of

28  this section, the employee or his or her designated agent shall make a written demand for the

United States District Court
For the Northern District of California

payment within sixty days after the date of separation and shall state in the demand where such payment can be received."). No such demands were made. Accordingly, HP is entitled to summary judgment on Colorado Plaintiffs' section 8-4-109 claims.[24]

Plaintiffs argue that the absence of a written demand "does not affect Plaintiffs' right to reimbursement of wages, interest, and attorney fees." Consol. Opp'n to Mots. for Summ. J. at 23. In support, they cite to section 8-4-110 and <u>Fang v. Showa Entetsu Co.</u>, 91 P.3d 419 (Colo. App. 2003). Plaintiffs' argument is not persuasive.

First, <u>Fang</u> was decided under a different statutory scheme regarding attorneys' fees and is not relevant to this dispute. Second, the current scheme provides in pertinent part that "[i]f, in any [] action in which the employee seeks to recover any amount of wages or compensation, <u>the employee recovers a sum greater than the amount tendered by the employer</u>, the court may award the employee reasonable costs and attorney fees incurred in such action." Colo. Rev. Stat. § 8-4-110(1) (emphasis added). A written demand triggers the employer's opportunity to tender. Colo. Rev. Stat. § 8-4-109(3)(a.5) ("[I]f, <u>within fourteen days after the employee's demand</u>, the employer makes a legal tender of the amount that the employer in good faith believes is due, the employer shall not be liable for any penalty unless, in a legal action, the employee recovers a greater sum than the amount so tendered.") (emphasis added). The Court does not believe that the Colorado legislature intended for employees to recover attorneys' fees without first recovering more than the employer tendered in response to a demand. Such a system would undermine the entire demand/tender framework, which incentivizes settlement by encouraging employer's to tender and employee's to accept by interlocking carrots and sticks related to recovery of attorneys' fees. <u>See</u> Michael J. Guyerson & Christian C. Onsager, *The Colorado Wage Act, Employee Status, and Terms of Compensation*, 35-May Colo. Law. 63, 66 (2007). Thus, the absence of a demand scuttles Plaintiffs' section 8-4-109.

---

[24] As mentioned, Simmons and Riese were issued small checks after leaving HP, and the Court assumes for purposes of this discussion that such money was earned and unpaid when they left. Even so, Simmons and Riese cannot create an issue of fact because it is undisputed that they did not make a demand.

United States District Court
For the Northern District of California

1   Section 8-4-103.  This section provides that "[a]ll wages or compensation, other than

2   those mentioned in section 8-4-109, earned by any employee in any employment . . . shall be

3   due and payable for regular pay periods of no greater duration than one calendar month or

4   thirty days, whichever is longer, and on regular paydays no later than ten days following the

5   close of each pay period unless the employer and the employee shall mutually agree on any

6   other alternative period of wage or salary payments."

7   HP is entitled to summary judgment on Plaintiffs' section 8-4-103 claims for two

8   primary reasons.  First, section 8-4-103 does not provide penalties for late payments.[25]  See

9   16 Colo. Prac. Employment Law & Prac. § 7.58 (2d ed. 2010) ("The penalty for refusing to

10   pay wages applies only to compensation due former employees; current employees may not

11   seek the statutory penalty for wages wrongfully withheld during their employment.").

12   Second, Plaintiffs have no evidence that HP failed to pay them incentive pay timely after it

13   was credited pursuant to their contracts.[26]

14   Section 8-4-105.  This section governs when an employer may make payroll

15   deductions.  Other than asserting generally that they were not paid everything they were

16   owed, Plaintiffs do not identify any wrongful "deductions" made by HP with respect to their

17   incentive pay.  Thus, HP is entitled to summary judgment on Plaintiffs' section 8-4-105

18   claims.[27]

19   **5.   HP Is Entitled To Summary Judgment On Plaintiffs' UCL Claim**

20   Purvis argues in opposing HP's Motion for Summary Judgment as to his UCL claim

21   that his UCL claim survives because he has valid claims under the Labor Code.  Opp'n to

---

[25] It does provide for penalties "if, two or more times within any twenty-four-month period, the employer causes an employee's check . . . to not be paid because the employer's bank does not honor an employee's check upon presentment." Colo. Rev. Stat. § 8-4-103(b).  Plaintiffs do not allege that their checks were not honored.

[26] As mentioned, Simmons and Riese were issued checks after they left HP.  That does not support a section 8-4-103 claim because HP has already made them whole and section 8-4-103 does not provide penalties.  Further, neither Simmons nor Riese have evidence that their "late" payments breached any contractual provisions as to when incentive pay was earned.

[27] Plaintiffs did not address HP's argument regarding section 8-4-105 in their Consolidated Opposition to HP's Motions for Summary Judgment.

33

United States District Court
For the Northern District of California

1  Mot. Summ J. at 24.  To the contrary, none of Purvis's Labor Code claims has survived, and

2  HP is therefore entitled to summary judgment on Purvis's UCL claim as well.  See Krantz v.

3  BT Visual Images, LLC, 89 Cal. App. 4th 164, 178 (2001).

4          **6.      HP Is Entitled To Summary Judgment On Plaintiffs' Claims For
              An Accounting**

5          HP is also entitled to summary judgment on Plaintiffs' claims for an accounting.

6  Plaintiffs have failed to show that they are owed any money by HP such that an accounting is

7  proper to ascertain that unliquidated and un-ascertained liability.  See, e.g., Fintland v.

8  Luxury Marine Group, LLC, No. CV 09-4267 AHM (AGRx), 2010 WL 758543, at *7 (C.D.

9  Cal. Mar. 1, 2010); Duggal v. G.E. Capital Comm. Serv., Inc., 81 Cal. App. 4th 81, 95

10  (2000); Bradshaw v. Thompson, 454 F.2d 75, 79 (6th Cir. 1972).

11  **III.    CONCLUSION**

12          HP might have underpaid (and/or paid late) some its sales representatives.  Plaintiffs,

13  however, have failed to show that they were underpaid (or paid late) in breach of their

14  contracts.  Similarly, they have not turned up any evidence of a "computer glitch" or system

15  wide Omega malfunction causing uniform failure to credit sales representatives for

16  everything they were entitled to.  Nor is it appropriate to allow Plaintiffs to amend the

17  Complaint and restart discovery to see if they can use HP's raw data to prove their claims.

18  Accordingly, and for the foregoing reasons, Plaintiffs' Motion to Amend is DENIED.  HP's

19  Motions for Summary Judgment are GRANTED.  The discovery rulings, other than DMO

20  10, are hereby affirmed.  HP's specific objections to DMO 10 are DENIED as moot.

21          **IT IS SO ORDERED.**

22

23

24  Dated: August 12, 2011                    _____
                                              CHARLES  R. BREYER
                                              UNITED STATES DISTRICT JUDGE

25

26

27

28